# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| | NO. |
| THE BOOTH FAMILY TRUST, derivatively on behalf of BIOGEN INC., | |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| MICHEL VOUNATSOS, STELIOS PAPADOPOULOS, ALEXANDER J. DENNER, CAROLINA D. DORSA, JESUS B. MANTAS, WILLIAM A. HAWKINS, NANCY L. LEAMING, RICHARD C. MULLIGAN, BRIAN S. POSNER, ERIC K. ROWINSKY, and STEPHEN A. SHERWIN, | |
| Defendants, | |
| -and- | |
| BIOGEN INC., | |
| Nominal Defendant. | |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff, the Booth Family Trust, by its undersigned attorneys, brings this stockholder derivative action on behalf of nominal defendant Biogen Inc. ("Biogen" or the "Company") against the members of the Company's Board of Directors for their breaches of fiduciary duties,

violations of the federal securities laws, and other misconduct that resulted in material damage to the Company and its stockholders. These allegations are made upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief based upon the investigation and analysis by Plaintiff's counsel, including, among other things, a review of the Company's press releases and public filings with the United States Securities and Exchange Commission ("SEC"), corporate governance documents published on the Company's website, transcripts of Biogen investor conference calls, news reports, financial analyst reports, and other publicly available information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of Biogen against the current members of its Board of Directors (the "Board" or the "Individual Defendants") for their breaches of fiduciary duties, violations of the federal securities laws, and other misconduct.

2.      The Individual Defendants were required as directors of a public company to fulfill the highest fiduciary duties of loyalty, good faith and due care.  As part of their fiduciary duties, they were required to ensure that Biogen implemented and maintained an effective system of internal controls to ensure that the Company operated in compliance with the laws, rules and regulations that guide its core operations.  Likewise, they were required to act when faced with red flags of misconduct.  The Individual Defendants utterly failed to fulfill these fiduciary duties owed to Biogen and its stockholders.

3.     The Individual Defendants' failures to fulfill their fiduciary duties has resulted in significant damage to Biogen and its stockholders, leading to a substantial fine and censure by the federal government, a securities fraud class action lawsuit, and a lawsuit for close to two billion dollars in damages brought by an insurance provider.

4.     First, the Department of Justice charged Biogen and co-conspirators of running a "seed and sweep" scheme in violation of the Anti-Kickback Statute ("AKS") in connection with its sales and marketing practices for three multiple sclerosis drugs, Tysabri, Avonex, and Tecfidera (collectively the "MS Drugs").  Biogen initially "seeded" the market by dispensing the MS Drugs free of charge to thousands of patients who did not have insurance coverage or whose insurance did not cover the prohibitively priced drugs.  Biogen then proceeded to "sweep" the patients from its free-drug program into Medicaid Part D, and illegally covered the patients' substantial co-pays by funneling money through patient assistance programs ("PAPs").

5.     In 2016, Biogen disclosed that the United States Department of Justice (the "DOJ") had subpoenaed records regarding the Company's sales and marketing practices.  A whistleblower suit was subsequently brought against Biogen under the False Claims Act, 31 U.S.C. § 3730 (b)(2), and related state laws (the "Whistleblower Action") detailing the illegal seed and sweep scheme.  After conducting a thorough investigation into Biogen and the PAPs, the DOJ intervened in the Whistleblower Action.  Ultimately, Biogen was fined $22 million and its co-conspirators fined millions more for their parts in the scheme.[1]

---

[1]     Department of Justice, Office of Public Affairs, *Biogen Agrees to Pay $22 Million to Resolve Alleged False Claims Act Liability for Paying Kickbacks*, Dec. 17, 2020, https://www.justice.gov/opa/pr/biogen-agrees-pay-22-million-resolve-alleged-false-claims-act-liability-paying-kickbacks; Department of Justice, U.S. Attorney's Office, *Third Foundation Resolves Allegations that it Conspired with Pharmaceutical Companies to Pay Kickbacks to*

6.    The damage to Biogen from the Individual Defendants' breaches of fiduciary duty and other misconduct continues, however, as Biogen was recently sued for close to two billion dollars by Humana, a Medicaid insurance provider, to recover the amounts it paid to cover improper Medicaid claims submitted as part of the seed and sweep scheme.

7.    Second, Biogen engaged in a scheme to tailor data from clinical studies for its drug to treat Alzheimer's disease, aducanumab, and to pressure the United States Food and Drug Administration (the "FDA") to approve the drug.

8.    In March of 2019, the Company terminated its clinical trials of aducanumab because they indicated that the drug was not effective.  In light of the importance of the drug to Biogen's business plan, however, Biogen determined to adjust the data and findings from its clinical studies to make it appear that a different conclusion could be reached.  Behind the scenes, Biogen's Chief Medical Officer secretly met with the Head of the FDA Office of Neuroscience, an old colleague, to push for approval. Biogen officials and FDA officials subsequently agreed to collaborate on getting FDA approval for aducanumab. The Board appears to have been expressly informed of the improper agreement.

9.    Despite this collaboration, and attempts to conceal negative data analyses, an FDA advisory committee ("Advisory Committee") voted almost unanimously against the approval of the Alzheimer drug.  Regardless, Biogen pressed forward.  Eventually, the head of the FDA's oncology office extended a lifeline to the Company by suggesting accelerated approval of the drug based on its ability to remove plaque, an angle Biogen had never seriously

---

*Medicare Patients,* Nov. 20, 2019, https://www.justice.gov/usao-ma/pr/third-foundation-resolves-allegations-it-conspired-pharmaceutical-companies-pay-kickbacks.

pursued.  At a meeting convened to determine whether the FDA would approve aducanumab for its ability to remove plaque, Biogen worked with its FDA collaborators to invite, and empower with a vote, the heads of certain FDA offices with no connection to Alzheimer drugs.

10.     On June 7, 2021, the FDA approved aducanumab.  The decision and a subsequent investigative report revealing the collaboration between Biogen and the FDA were met with shock and dismay by regulators, hospitals and clinics.   Three of nine permanent Advisory Committee members resigned, with one calling the approval "probably the worst drug approval decision in recent U.S. history."[2]

11.     The government launched several investigations into the approval and dozens of hospitals and more than a thousand outpatient clinics refused to prescribe the Alzheimer drug, arguing against its efficacy. The SEC and the Federal Trade Commission  ("FTC") have also launched independent investigations. Insurers called the drug "experimental and investigational" and refused to cover it. The FDA is investigating the recent death of a patient shortly after taking aducanumab.

12.     Two securities class actions have since been filed against the Company and certain of its directors and officers for their false and misleading statements and material omissions concerning the clinical trials of aducanumab and its approval by the FDA that artificially inflated the price of Biogen stock.  The Company is subject to substantial costs defending itself in the lawsuits and will be subject to substantial further costs in resolving them.

---

[2]      Jeffrey Toobin, *The Road to Aduhelm: What One Ex-FDA Adviser Called 'Probably the Worst Drug Approval Decision in Recent US History' for an Alzeheimer's Treatment,* CNN, Sept. 27, 2021, https://www.cnn.com/2021/09/26/politics/alzheimers-drug-aduhelm-fda-approval/index.html.

13.     In its latest Proxy Statement, Biogen made certain materially false and misleading statements and omissions regarding the Board's oversight and risk management practices, corporate governance practices, and commitment to the recoupment of illegally obtained compensation. The Proxy Statement also omitted material information concerning the Company's lack of internal controls and violations of healthcare laws, rules, and regulations. These false and misleading statements and omissions were intended to—and did—induce shareholder approval of the election of nearly all of the Individual Defendants to the Board.

14.     Plaintiff did not make a demand prior to bringing this action because it would be futile.  The Company's directors are neither disinterested nor independent.  In the absence of this action, Biogen will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.     JURISDICTION AND VENUE

15.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff alleges claims arising under the laws of the United States. The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a) because they are related to the claims arising under this Court's original jurisdiction and part of the same case or controversy.  This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     This Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District or is an individual who is either present in this District for jurisdictional purposes or has

sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.  Biogen maintains its principal executive offices in this District.  Thus: (i) one or more of the Individual Defendants either resides or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iii) the Individual Defendants have received substantial compensation in this District by doing business and engaging in activities having an effect in the District.

## III.   PARTIES

### A.    Plaintiff

18.     Plaintiff acquired Biogen shares in June 2009 and has held those shares continuously since that time.  As such, Plaintiff was a Biogen shareholder at the time of the transactions complained of herein.

### B.    Defendants

#### 1.    Nominal Defendant Biogen Inc.

19.     Nominal Defendant Biogen is a global biotechnology company with its principal place of business in this District at 225 Binney Street, Cambridge, MA 02142. Biogen's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "BIIB."

#### 2.    Individual Defendants

##### a.    Defendant Vounatsos

20.     Defendant Michel Vounatsos ("Vounatsos") is Biogen's Chief Executive Officer ("CEO") and has served as a director since January 2017.  Vounatsos joined Biogen as Executive

Vice President & Chief Commercial Officer in April 2016, holding that role until his promotion to CEO on January 6, 2017.

21.     As of April 5, 2021, Vounatsos beneficially owns 53,072 Biogen shares. According to the Company's Proxy Statement, he received the compensation outlined in the chart below for fiscal year 2020:

|  | Salary | Stock Awards | Non-Equity Plan Compensation | Other Compensation[3] | Totals |
|---|---|---|---|---|---|
| 2020 | $1,500,000 | $13,887,064 | $2,565,000 | $719,303 | $18,659,829 |

### b.     Defendant Papadopoulos

22.     Defendant Stelios Papadopoulos ("Papadopoulos") has served as a Biogen director since 2008 and has served as Chair of the Board since 2014.  Papadopoulos is a member of the Corporate Governance Committee.  Papadopoulous co-founded Anadys Pharmaceuticals, Inc. ("Anadys") and was a member of its board of directors until its acquisition by F. Hoffmann-La Roche AG in 2011, serving as the Chairman of the Board during 2011.  Papadopoulos is an Adjunct Associate Professor of cell biology at New York University School of Medicine ("NYU").

---

[3]     Included in this figure is $264,358 which represents a change in pension value and nonqualified deferred compensation earnings.

23.     As of April 5, 2021, Papadopoulos beneficially owns 34,771 Biogen shares. Defendant Papadopoulos received the compensation outlined in the chart below for serving as a Biogen director in fiscal year 2020:

|      | Fees earned or paid in cash | Stock Awards | Other Compensation | Totals |
|------|------|------|------|------|
| 2020 | $215,000 | $444,822 | $10,000 | $669,822 |

### c.     Defendant Denner

24.     Defendant Alexander J. Denner ("Denner") has served as a Biogen director since 2009. Denner is also the Chair of the Corporate Governance Committee. Denner is a founding partner and Chief Investment Officer of Sarissa Capital Management L.P. ("Sarissa"), a registered investment advisor. Before founding Sarissa, Denner served as a Senior Managing Director at Icahn Capital L.P. ("Icahn Capital") for five years. Denner sat on the board of Bioverativ Inc. ("Bioverativ"), a spinoff from Biogen, from 2017 until it was sold to Sanofi S.A. ("Sanofi"), a French multinational pharmaceutical corporation, in 2018. Denner also previously served as a director of ImClone Systems ("ImClone") before its sale to Eli Lilly and Company ("Eli Lilly").

25.     As of April 5, 2021, Denner beneficially owns 655,954 Biogen shares. Defendant Denner received the compensation outlined in the chart below for serving as a Biogen director in fiscal year 2020:

|      | Fees earned or paid in cash | Stock Awards | Other Compensation | Totals |
|------|------|------|------|------|
| 2020 | $155,000 | $269,314 | $15,000 | $439,314 |

### d.      Defendant Dorsa

26.      Defendant Caroline D. Dorsa ("Dorsa") has served as a Biogen director since 2010. Dorsa serves as the Chair of the Audit Committee.

27.      As of April 5, 2021, Dorsa beneficially owns 21,097 Biogen shares.  Defendant Dorsa received the compensation outlined in the chart below for serving as a Biogen director in fiscal year 2020:

|  | Fees earned or paid in cash | Stock Awards | Other Compensation | **Totals** |
|---|---|---|---|---|
| 2020 | $155,000 | $269,314 | N/A | $424,314 |

### e.      Defendant Leaming

28.      Defendant Nancy E. Leaming ("Leaming") has served as a Biogen director since 2008 and is a member of the Audit Committee.  Leaming currently sits on the board of directors of Rosie's Place, a non-profit organization, and serves as Chair of its Audit Committee.

29.      As of April 5, 2021, Leaming beneficially owns 12,988 Biogen shares.  Defendant Leaming received the compensation outlined in the chart below for serving as a Biogen director in fiscal year 2020:

|  | Fees earned or paid in cash | Stock Awards | Other Compensation | **Totals** |
|---|---|---|---|---|
| 2020 | $140,000 | $269,314 | $28,500 | $437,814 |

### f.      Defendant Mantas

30.     Defendant Jesus B. Mantas ("Mantas") has served as a Biogen director since 2019 and is a member of the Audit Committee.

31.     As of April 5, 2021, Mantas beneficially owns 2,943 Biogen shares.  Defendant Mantas received the compensation outlined in the chart below for serving as a Biogen director in fiscal year 2020:

|      | Fees earned or paid in cash | Stock Awards | Other Compensation | Totals |
|------|-----------------------------|--------------|--------------------|--------|
| 2020 | $140,000                    | $269,314     | N/A                | $409,314 |

### g.     Defendant Hawkins

32.     Defendant William A. Hawkins ("Hawkins") has served as a Biogen director since 2019 and is a member of the Audit Committee.

33.     As of April 5, 2021, Hawkins beneficially owns 2,045 Biogen shares.  Defendant Hawkins received the compensation outlined in the chart below for serving as a Biogen director in fiscal year 2020:

|      | Fees earned or paid in cash | Stock Awards | Other Compensation | Totals |
|------|-----------------------------|--------------|--------------------|--------|
| 2020 | $140,000                    | $269,314     | N/A                | $409,314 |

### h.     Defendant Mulligan

34.     Defendant Richard C. Mulligan ("Mulligan") has served as a Biogen director since 2009 and is a member of the Compensation and Management Development Committee (the "Compensation Committee").  Mulligan previously served as a Portfolio Manager at Icahn

Capital from 2017 to 2018.  Mulligan was also a founding partner of Sarissa and previously served as a director on the board of ImClone before its sale to Eli Lilly.

35.     As of April 5, 2021, Mulligan beneficially owns 12,954 Biogen shares. Defendant Mulligan received the compensation outlined in the chart below for serving as a Biogen director in fiscal year 2020:

|  | Fees earned or paid in cash | Stock Awards | Other Compensation | **Totals** |
|---|---|---|---|---|
| 2020 | $140,000 | $269,314 | N/A | $409,314 |

### i.     Defendant Posner

36.     Defendant Brian S. Posner ("Posner") has served as a Biogen director since 2008 and is Chair of the Compensation Committee.  Posner was Chair of the Board of Bioverativ until it was acquired by Sanofi.  Posner was previously on the board of Anadys, the biopharmaceutical company founded by Papadopoulos.

37.     As of April 5, 2021, Posner beneficially owns 7,760 Biogen shares.  Defendant Posner received the compensation outlined in the chart below for serving as a Biogen director in fiscal year 2020:

|  | Fees earned or paid in cash | Stock Awards | Other Compensation | **Totals** |
|---|---|---|---|---|
| 2020 | $140,000 | $269,314 | $25,000 | $434,314 |

### j.     Defendant Rowinsky

38.     Defendant Eric K. Rowinsky ("Rowinsky") has served as a Biogen director since 2010 and is a member of the Corporate Governance Committee.  Rowinsky is an Adjunct Professor of Medicine at New York University.  Rowinsky previously served as a director on the board of ImClone before its sale to Eli Lilly.

39.     As of April 5, 2021, Rowinsky beneficially owns 17,069 Biogen shares. Defendant Rowinsky received the compensation outlined in the chart below for serving as a Biogen director in fiscal year 2020:

|  | Fees earned or paid in cash | Stock Awards | Other Compensation | **Totals** |
|---|---|---|---|---|
| 2020 | $140,000 | $269,314 | N/A | $409,314 |

### k.     Defendant Sherwin

40.     Defendant Stephen A. Sherwin ("Sherwin") has served as a Biogen director since 2010 and is a member of the Audit Committee.

41.     As of April 5, 2021, Sherwin beneficially owns 16,328 Biogen shares.  Defendant Sherwin received the compensation outlined in the chart below for serving as a Biogen director in fiscal year 2020:

|  | Fees earned or paid in cash | Stock Awards | Other Compensation | **Totals** |
|---|---|---|---|---|
| 2020 | $140,000 | $269,314 | N/A | $409,314 |

## IV.     THE INDIVIDUAL DEFENDANTS' DUTIES

42.     By reason of their positions as officers and directors of Biogen, and because of their   ability to control the business and corporate affairs of Biogen, the Individual Defendants

owed and owe Biogen and its stockholders fiduciary obligations of loyalty, good faith, due care, and candor. The Individual Defendants were and are required to use their utmost ability to control and manage Biogen in a fair, just, honest, and equitable manner and to ensure that Biogen is and was complying with federal, state and local laws, rules and regulations relevant to its operations. The Individual Defendants were also responsible for ensuring that complete and accurate information was disseminated to government agencies, the Company's stockholders and the investing public.

43. To discharge their duties, the officers and directors of Biogen were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and corporate affairs and assets of the Company. By virtue of such duties, the directors of Biogen were required to, among other things[4]:

- Review, approve, and monitor the Company's fundamental financial and business strategies and related risks, including major corporate actions, material transactions, material research and development activities, significant manufacturing activities, intellectual property strategy and material government and other investigations;

- Oversee and review the Company's risk framework and governance and management's exercise of its responsibility to assess, monitor and manage the Company's significant risk exposures; and

- Ensure processes are in place for maintaining the integrity of the Company, including with respect to its reputation, financial statements, public disclosures, compliance with law and ethics and relationships with patients, the medical community and other stakeholders.

---

[4] Biogen, Corporate Governance Principles, https://investors.biogen.com/static-files/41ef931f-311c-45ea-abc8-686d1eddb1c4 (last visited Jan. 18, 2022).

44.     Additionally, under Biogen's Corporate Governance Guidelines, each director is required to "to act ethically at all times and to acknowledge their adherence to the policies comprising Biogen's Code of Business Conduct" (the "Code of Conduct").

**A.     Additional Duties Under The Code Of Business Conduct**

44.     The Code of Conduct is applicable to "all employees, officers and directors."[5]

45.     In introducing the Code of Conduct, Defendant Vounatsos states:

At Biogen, we hold ourselves to the highest standard of business and professional conduct. As a result, all of our stakeholders, including our shareholders, continue to trust our products and services.

***

This Code of Business Conduct describes how we put our cultural Elements into action with a ***focus on ethics.***

***

The following . . . Ethical Principles that comprise key sections of our code, are equally critical to the success of our company:

***

- We are responsible to our communities
- We are fair and honest
- We are transparent and ethical
- We never compromise our integrity

***

Any success that we achieve, if not achieved ethically, is no success at all.

***

As an employee of Biogen, you have been afforded the opportunity to be part of a company that has improved countless lives. With that privilege comes the responsibility to meet the highest level of ethical and legal standards. The company expects this of you, as do the patients and customers we serve.

***

We are committed to always act with integrity and honesty and to remain true to our heritage and the promise of our future. We are all responsible for Biogen.

---

[5]     Biogen, Code of Business Conduct, https://www.biogen.com/en_us/code-of-business-conduct.html (last visited Jan. 18, 2022).

The quality of our people and our commitment to ethics and compliance will not only enable us to succeed today but will help us to thrive and excel. Working together, with the help of this Code, we will not only meet our goals, but we will also continue to be proud of how we achieve success.

46.     As part of their responsibilities, the Code of Conduct requires Biogen employees

to:

- Always act in a professional, honest, and ethical manner when acting on behalf of the Company;
- Be familiar with the information contained in this Code as well as Company policies;
- Promptly report concerns about possible violations of laws, regulations, this Code and policies to your supervisor or to any of the resources listed in this Code;
- Remember: no reason, including the desire to meet business goals, is an excuse for violating laws, regulations, the Code or policies.

47.     The Code of Conduct discusses proper sales and marketing practices, warning

employees to "Watch Out For":

- False or misleading information or misrepresentations of our products or those of the competition
- Overstatement of the efficacy of our products
- Statements that downplay or minimize the risks

48.     The Code of Conduct describes the proper interaction with health care

professionals:

Healthcare professionals must determine the best course of care for their patients, and Biogen is committed to providing timely information to assist them in treatment decisions. This includes fair, accurate, and balanced product information, scientific and medical information, and safety information.

***

When Biogen interacts with healthcare professionals, it does so with honesty, fairness and integrity. Our Written Standards, including this Code and Company policies, reflect the requirements of industry association codes and applicable laws that prohibit misuse of influence, improper incentives, kickbacks, bribes, or

anything of value in exchange for recommendation, use, prescription, or referral of products or services.

*** 

MAKE SURE YOU[:]

- Examine all relationships and arrangements with referral sources, physicians, vendors and suppliers to be certain there are no kickbacks for the referral of patients or for prescriptions written.

49.     The Code of Conduct stresses the need to be "transparent and communicate truthful information in a manner that is not misleading," stating further:

We operate fairly and honestly with all of our stakeholders and business partners and expect that they will do the same. Our books, records and financial statements must be honest, accurate, objective, complete and timely in order to ensure we make sound business decisions.

50.     The Code of Conduct details the requirement to produce timely, accurate, and complete records:

Our Company is subject to extensive and complex reporting requirements. Our operations must comply with all applicable regulatory, accounting, financial, tax and other rules and regulations of the jurisdictions in which we operate.

*** 

The Company's filings with the Securities and Exchange Commission, as well as other public disclosures by or on behalf of our Company, must be fair, complete, accurate, timely, and understandable.

51.     Regarding the requirement to act in a transparent and ethical manner, the Code of Conduct admonishes employees not to pay kickbacks or bribes:

We do not offer or provide improper incentives, kickbacks, or bribes to win business, to influence a business or prescribing decision, or to advance our interests with government authorities. In particular, our interactions with healthcare professionals, government entities, government employees, and others

must be legitimate and never to obtain an improper advantage or to improperly influence or encourage a decision by them.

**Cooperating with regulators**

We will always comply with relevant laws and regulations and cooperate with government agencies, law enforcement officials and investigators.

***

**Avoiding bribery and corruption**

We do business with honesty and integrity and comply with all applicable ethical and legal standards.

***

We are responsible for third parties acting on our behalf.  We perform due diligence and carefully monitor our business partners and require them to operate in compliance with our Code and our standards.

### B.      Additional Duties Under Biogen's Compliance Program

52.     Biogen has a Comprehensive Compliance Program ("Compliance Program") which places additional duties on all its employees, directors and officers.[6]

53.     The Compliance Program is intended to ensure that Biogen conducts business with "integrity and ethically."

54.     The Compliance Program was developed in accordance with the laws applicable to the biotechnology industry and the "Program Guidance for Pharmaceutical Manufacturers" published by the United States Department of Health and Human Services ("HHS"), Office of the Inspector General ("OIG").

---

[6]      Biogen, Comprehensive Compliance Program, https://investors.biogen.com/static-files/fa732951-4617-4cad-b1c1-78f8e07c392d (last visited Jan. 18, 2022).

55.     Consistent with the OIG Guidance, Biogen's Compliance Program includes, *inter alia*:

- Written standards of conduct, policies, and practices that verbalize the company's commitment to compliance and set forth the ethical and compliance principles applicable to all employees.
- Written compliance materials that address specific areas of potential fraud and abuse, including risk areas relating to the prohibition of kickbacks and illegal remuneration to persons or entities in a position to generate federal health care business for the company, either directly or indirectly.

56.     Biogen also has policies that "prohibit illegal remuneration in violation of federal and state anti-kickback statutes" including requiring appropriate:

- Making of grants and charitable contributions so that such funds are not conditioned, express or implied, on any agreement to prescribe, purchase, recommend, influence or provide favorable formulary status for any Biogen product.
- Promotion of Biogen products in compliance with the U.S. Food and Drug Administration's regulatory framework regarding promotion of pharmaceutical products.

**C.     Additional Duties Under The Corporate Governance Committee Charter**

57.     The Corporate Governance Committee Charter places additional duties on the members of the Corporate Governance Committee,[7] including requirements that its members:

- Develop and recommend to the Board for approval a set of corporate governance principles.  The Committee shall review the principles on a regular basis and recommend changes as necessary, and shall also monitor compliance with the principles.
- Review the Company's significant corporate governance and board succession risks and steps taken to monitor and mitigate such risks.
- Review the Company's Code of Business Conduct on a periodic basis.
- Review and make recommendations to the Board regarding shareholder proposals relating to corporate governance, and consider significant corporate governance issues that arise from time to time.

---

[7]     Biogen, Corporate Governance Committee Charter, https://investors.biogen.com/static-files/f9ec86c5-84d3-47e3-88c9-ee7f05578642 (last visited  Jan. 18, 2022).

**D.** **Additional Duties Under The Audit Committee Charter**

58.    The Audit Committee Charter places additional duties on the members of the

Audit Committee,[8] including requirements that its members:

- Review with management the Company's assessment of its significant financial, accounting, disclosure, ABAC (anti-bribery and corruption) and distributor risk exposures and steps taken by management to monitor and mitigate such exposures.
- Oversee the Company's ABAC, patient, healthcare provider and third party payor compliance program ("Corporate Compliance Program") and Chief Compliance Officer ("CCO").
- Receive regular updates from the CCO regarding the effectiveness of the Corporate Compliance program, progress against goals and monitoring results.
- Review management's exercise of its responsibility to assess and manage financial, capital and credit risks.

## V.    SUBSTANTIVE ALLEGATIONS

**A.    OIG Guidance On The Risk Of Violations Of Fraud And Abuse Laws Through Interactions With PAPs**

59.    The Office of the Inspector General has repeatedly warned companies such as

Biogen, about the potential of running afoul of fraud and abuse laws through interactions with

PAPs.

60.    For example, in a November 2005 Supplemental Special Advisory Bulletin, the

OIG provided guidance on the application of fraud and abuse laws to PAPs.  Specifically, the

OIG noted that some charities focus their efforts on patients with particular diseases, and that

donors may earmark funds for patients with those specific diseases.  Donations in these

scenarios, the OIG explained, presented an "elevated risk" of fraud and abuse.  As a result, it was

recommended that companies limit earmarked donations to PAPs.

---

[8]    Biogen, Audit Committee Charter, https://investors.biogen.com/static-files/dbd50fdc-20e5-4732-b516-d0ceaed8fdff (last visited Jan. 18, 2022).

61.     In a 2008 advisory opinion, the OIG directly warned against "problematic programs that offer free goods or other remuneration to prescribers as a means to 'seed' or introduce new products into the marketplace."  OIG Advisory Opinion No. 08-04 (Feb. 5, 2008) at 6.

62.     In a November 4, 2013 FAQ, the Health and Human Services Secretary recommended that insurance issuers reject third party premium payments.   Specifically, the HHS Secretary stated:

> The Department of Health and Human Services (HHS) has broad authority to regulate the Federal and State Marketplaces (*e.g.*, section 1321(a) of the Affordable Care Act). It has been suggested that hospitals, other healthcare providers, and other commercial entities may be considering supporting premium payments and cost-sharing obligations with respect to qualified health plans purchased by patients in the Marketplaces. HHS has significant concerns with this practice because it could skew the insurance risk pool and create an unlevel field in the Marketplaces. HHS discourages this practice and encourages issuers to reject such third party payments. HHS intends to monitor this practice and to take appropriate action, if necessary.

63.     In a May 30, 2014 Supplemental Special Advisory Bulletin (the "2014 Bulletin"), the OIG again weighed in on the issues relating to PAPs and charities, stating that donor contributions may implicate the federal Anti-Kickback Statute if made to induce a PAP to recommend donor products or otherwise influence patients.  The OIG explained further:

> Two remunerative aspects of PAP arrangements require scrutiny under the anti-kickback statute: donor contributions to PAPs (which can also be analyzed as indirect remuneration to patients) and PAPs' grants to patients. If a donation is made to a PAP to induce the PAP to recommend or arrange for the purchase of the donor's federally reimbursable items, the statute could be violated. Similarly, if a PAP's grant of financial assistance to a patient is made to influence the patient to purchase (or to induce the patient's physician to prescribe) certain items, the statute also could be violated. A determination regarding whether a particular arrangement violates the anti-kickback statute requires an individualized evaluation of all of the relevant facts and circumstances, including the parties'

intent.  For PAPs, the nature, structure, sponsorship, and funding of the particular
PAP are factors relevant to the analysis.

64.     In the 2014 Bulletin, the OIG also expressed concerns regarding charities
recommending the products of donors, suggesting the fund is operated to induce the purchase of
the donor's products.  Specifically, the OIG emphasized that:

> A charity with narrowly defined disease funds may be subject to scrutiny if the
> disease funds result in funding exclusively or primarily the products of donors or
> if other facts and circumstances suggest that the disease fund is operated to induce
> the purchase of donors' products.

65.     The OIG elaborated in the 2014 bulletin that donors to these types of charities
should  not be provided with information sufficient to match their donations with the number of
recipients using their products, stating that efforts by donors to do that "may be indicative of a
donor's intent to channel its financial support to copayments of its own products, which would
implicate the anti-kickback statute."

66.     In subsequent guidance in August 2015, the OIG identified "problematic
'seeding' programs in which a manufacturer might offer a drug for free or at a greatly reduced
cost to induce a patient onto that drug and for the patient to obtain subsequent supplies that
would be billed to Federal health care programs."  OIG Advisory Opinion No. 15-11, at 7 (HHS
OIG Aug. 5, 2015).

### B.     The Individual Defendants Knew The Risks Associated With
### Biogen's Sales And Marketing Practices And Drug Development

67.     The Individual Defendants were well aware of the material risks posed to Biogen
in complying with the laws, rules, and regulations that govern its operations.  Indeed, in Biogen's

Annual Reports on Form 10-K from 2015 to 2020,[9] the substantial risks of complying with sales and marketing regulations were disclosed:

### Regulation Pertaining to Sales and Marketing

We are subject to various federal and state laws pertaining to health care "fraud and abuse," including anti-kickback laws and false claims laws. Anti-kickback laws generally prohibit a prescription drug manufacturer from soliciting, offering, receiving, or paying any remuneration to generate business, including the purchase or prescription of a particular drug. Although the specific provisions of these laws vary, their scope is generally broad and there may be no regulations, guidance or court decisions that clarify how the laws apply to particular industry practices. ***There is therefore a possibility that our practices might be challenged under the anti-kickback or similar laws. False claims laws prohibit anyone from knowingly and willingly presenting, or causing to be presented for payment to third-party payors (including Medicare and Medicaid) claims for reimbursed drugs or services that are false or fraudulent, claims for items or services not provided as claimed, or claims for medically unnecessary items or services.***[10] Our activities relating to the sale and marketing of our products may be subject to scrutiny under these laws. Violations of fraud and abuse laws may be punishable by criminal or civil sanctions, including fines and civil monetary penalties, and exclusion from federal health care programs (including Medicare and Medicaid). In the U.S., federal and state authorities are paying increased attention to enforcement of these laws within the pharmaceutical industry and private individuals have been active in alleging violations of the laws and bringing suits on behalf of the government under the federal civil False Claims

---

[9]     The 2015 Annual Report on Form 10-K was signed by Defendants Denner, Papadopoulos, Leaming, Mulligan, Posner, Sherwin, and Rowinsky. Subsequent Annual Reports on Form 10-K until fiscal year 2019, were signed by Defendants Vounatsos, Dorsa, Papadopoulos, Denner, Leaming, Mulligan, Rowinsky, and Sherwin.  On February 6, 2020, the Company filed its Annual Report on Form 10-K with the SEC for the period ended December 31, 2019 (the "2019 10-K").  On February 3, 2021, the Company filed its Annual Report on Form 10-K with the SEC for the period ended December 31, 2020 (the "2020 10-K"). The 2019 10-K and 2020 10-K were signed by all of the Individual Defendants.  All of the Annual Reports on Form 10-K, with the exception of the 2015 10-K, were signed by Defendant Vounatsos, verifying pursuant to SOX, that the reports fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company.

[10]     All emphasis has been added unless otherwise noted herein.

Act. ***If we were subject to allegations concerning, or were convicted of violating, these laws, our business could be harmed.***

68.    Biogen's Annual Reports on Form 10-K from 2015 to 2020 disclosed material

risks associated with the failure to comply with the extensive legal and regulatory requirements

governing Biogen operations:

> ***If we fail to comply with the extensive legal and regulatory requirements affecting the health care industry, we could face increased costs, penalties and a loss of business.***
>
> Our activities, and the activities of our collaborators, distributors and other third-party providers, are subject to extensive government regulation and oversight both in the U.S. and in foreign jurisdictions. The FDA and comparable agencies in other jurisdictions directly regulate many of our most critical business activities, ***including the conduct of preclinical and clinical studies***, product manufacturing, ***advertising and promotion***, ***product distribution***, adverse event reporting and product risk management. Our interactions in the U.S. or abroad with physicians and other health care providers that prescribe or purchase our products are also subject to government regulation designed to prevent fraud and abuse in the sale and use of the products and place greater restrictions on the marketing practices of health care companies. Health care companies such as ours are facing heightened scrutiny of their relationships with health care providers from anti-corruption enforcement officials. In addition, we along with many other pharmaceutical and biotechnology companies have been the target of lawsuits and investigations alleging violations of government regulation, including claims asserting submission of incorrect pricing information, impermissible off-label promotion of pharmaceutical products, payments intended to influence the referral of health care business, ***submission of false claims for government reimbursement,*** antitrust violations, or violations related to environmental matters. These risks may be heightened as we continue to expand our global operations and enter new therapeutic areas with different patient populations, which may have product distribution methods differing from those we currently utilize.
>
> ***
>
> ***Violations of governmental regulation may be punishable by criminal and civil sanctions against us, including fines and civil monetary penalties and exclusion from participation in government programs, including Medicare and Medicaid***, as well as against executives overseeing our business. In addition to penalties for violation of laws and regulations, we could be required to repay amounts we received from government payors, or pay additional rebates and interest if we are

found to have miscalculated the pricing information we have submitted to the government. ***Whether or not we have complied with the law, an investigation into alleged unlawful conduct could increase our expenses, damage our reputation, divert management time and attention and adversely affect our business.***

69.     Biogen's Annual Reports on Form 10-K from 2015 to 2020 demonstrated that the Company's directors were well aware of enhanced scrutiny of pharmaceutical sales and marketing through the use of PAPs: "There is also enhanced scrutiny of company-sponsored patient assistance programs, including insurance premium and co-pay assistance programs and donations to third party charities that provide such assistance."

70.     Biogen's Annual Reports on Form 10-K from 2015 to 2020 discussed the risks associated with clinical trials and the Company's reliance on the development of new products:

> ***Our long-term success depends upon the successful development of new products and additional indications for existing products.[11]***
>
> Our long-term viability and growth will depend upon successful development of additional indications for our existing products as well as successful development of new products and technologies from our research and development activities. . . .
>
> Product development is very expensive and involves a high degree of risk. Only a small number of research and development programs result in the commercialization of a product. ***Clinical trials may indicate that our product candidates lack efficacy***, have harmful side effects, result in unexpected adverse events, or raise other concerns that may significantly reduce the likelihood of regulatory approval. This may result in significant restrictions on use and safety warnings in an approved label, adverse placement within the treatment paradigm, or significant reduction in the commercial potential of the product candidate.
>
> ***
>
> ***Successful preclinical work or early stage clinical trials does not ensure success in later stage trials, regulatory approval or commercial viability of a product.[12]***

---

[11]     Emphasis in original.

[12]     Emphasis in original.

Positive results in a trial may not be replicated in subsequent or confirmatory trials. Additionally, success in preclinical work or early stage clinical trials does not ensure that later stage or larger scale clinical trials will be successful or that regulatory approval will be obtained. In addition, even if later stage clinical trials are successful, regulatory authorities may delay or decline approval of our product candidates. Regulatory authorities may disagree with our view of the data, require additional studies or disagree with our trial design or endpoints.

**C.     Biogen's Kickback Scheme**

**1.     Background**

71.     Drugs for the treatment of Multiple Sclerosis are expensive. Biogen's MS Drugs cost patients $50,000 to $80,000 per year and are a significant source of revenue for the Company.  In 2015, for example, the MS Drugs accounted for more than $8.4 billion in Biogen's revenues.   This revenue included billions of dollars in Medicare, Medicaid, and other government-funded coverage claims.   As of November 2013, Medicare, Medicaid, and other government-funded insurance comprised approximately 26.7% of Biogen's business.

72.     Medicare Part D, Medicare's program for prescription coverage, is crucial for MS patients who cannot afford the high price of these drugs.   Under this program, Medicare contracts with insurers ("Sponsors"), to administer prescription drug plans.   *See* 42 C.F.R. §423.4.  Premiums for Part D plans are split between insureds and Medicare funds generated from taxpayers.  The administration of Part D plans is regulated by the Centers for Medicare & Medicaid Services ("CMS"), a division of the United States Department of Health and Human Services, pursuant to one-year, annually renewable contracts.   The Sponsors enter into agreements with their providers, such as Biogen, which require the providers to certify compliance with state and federal law, as well as rules promulgated by government entities such as CMS.

73.     Under enabling legislation and relevant regulations, a Part D beneficiary may be required to make a partial payment for the cost of prescription drugs in the form of a copayment, coinsurance, or deductible. *See* 42 U.S.C. § 1395w-102.  In the case of Biogen's expensive MS Drugs, patients may be responsible for thousands of dollars in out-of-pocket costs.

74.     When a pharmacy dispenses drugs to a Part D member, the pharmacy submits a claim to the various Sponsors who in turn submit an electronic record of the claim, called a Prescription Drug Event, to CMS.[13]  Both pharmacies and drug manufacturers,[14] such as Biogen, are required to comply with "[f]ederal laws and regulations designed to prevent fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. §3729, *et seq*.) [the "FCA"], and the Anti-Kickback Statute (§1127B(b) of the Act)," *id.* §423.505(h)(l), and all other federal laws, regulations, and CMS instructions, as well as any additional contractual obligations assumed by the Part D Plan. *Id.* §423.505(i)(3). The Medicare-Medicaid Anti-Fraud and Abuse Amendments, known as the Anti-Kickback Statute (the "AKS"), 42 U.S.C. § 1320a-7b(b), provide criminal penalties for individuals or entities that knowingly and willfully offer, pay, solicit or receive remuneration to induce the referral of business reimbursable under a federal health benefits program. *Id.* "Remuneration" is broadly defined to include anything of value directly or indirectly, overtly or covertly, in return for purchasing, ordering, or recommending the purchase or order of any reimbursable item.  *Id.*

## 2.     The DOJ Investigation And Whistleblower Complaint

---

[13]     Generating and submitting PDE data is a condition of payment for CMS's provision of Medicare funds to Part D Plan sponsors.  *See* 42 C.F.R. § 423.322.

[14]     These entities are referred to as "downstream" or "related" entities.

75.     On April 21, 2016, Biogen filed with the SEC its Quarterly Report on Form 10-Q for the period ended March 31, 2016, disclosing that the DOJ was investigating the Company's relationship with certain undisclosed PAPs:

*Government Matters*

We have learned that state and federal governmental authorities are investigating our sales and promotional practices and have received related subpoenas. . . . On March 4, 2016 we received a subpoena from the federal government for documents relating to our relationship with non-profit organizations that provide assistance to patients taking drugs sold by Biogen.

76.     On February 3, 2017, a lawsuit was filed by a whistleblower in the United States District Court for the District of Massachusetts against Biogen captioned *United States, et al., v. Biogen, Inc., et al,* No. 17-10192 (D. Mass.), charging that Biogen improperly used its free-drug program and the PAPs as conduits to induce and steer thousands of MS patients to Biogen's costly drugs in violation of the False Claims Act, 31 U.S.C. § 3730 (b)(2), and related state laws, by engaging in a kickback scheme involving several specialty pharmacies and PAPs. The PAPs associated with the scheme included, among others, the Chronic Disease Fund ("CDF," later known as Good Days), the Patient Access Network Foundation ("PANF"), the Healthwell Foundation, and The Assistance Fund Inc. ("TAF").

77.     According to the Whistleblower Complaint, Biogen first seeded the market by distributing free MS drugs to patients through US Bioservices Corporation ('US Bioservices"), an independent specialty pharmacy.  The Company would then steer or "sweep" patients into Medicare or Medicaid Advantage Programs.  Biogen was aware that a significant portion of patients in free drug programs would obtain Medicare coverage.  In a November 2014 presentation prepared for Biogen by a third-party, Biogen was informed that an estimated 32.7%

of MS patients are covered by Medicare, another 10.7% by Medicaid, and another 3.7% by VA/Tricare and that "Medicare is expected to become the dominant payer for people with MS."[15]

78.    Biogen continually conducts Benefit Investigations ("BI"), either in-house or through third parties to determine when patients will be eligible to move from the free drug program to insurance such as Medicare.[16]  Biogen's Patient Services Department ("PSD") used the BI to identify which MS patients were eligible to be transferred from the free drugs programs.[17]  The PSD then contacted the identified patients and convinced them to consent to the switch, advising them that the change would cost them nothing.

79.    The Whistleblower Complaint alleges[18] that Biogen's internal documents show the substantial reduction of patients in the free drugs program from 2013 to 2015, because they were being swept into Medicare and Medicare Advantage programs, pursuant to Biogen's scheme:

| Drug | Change in percentage of patients in free drugs program from 2013 to 2015: |
|------|---------------------------------------------------------------------------|
| Tecfidera | 20.3% (2013 Q3) to 9.9% (2015 Q4) |
| Tysabri | 11.5% (2013 Q1) to 7.8% (2015 Q4) |

---

[15]    *United States, et al., v. Biogen Inc., et al.,* No. 17-10192 (D. Mass. Feb. 3, 2017), ECF No. 5, ("Whistleblower Complaint") ¶96.

[16]    Biogen, Benefits Investigation Worksheet, https://www.tysabrihcp.com/content/dam/commercial/tysabri/hcp/en_us/pdf/benefits-investigation-worksheet.pdf (last visited Dec. 27, 2021).

[17]    *See* Whistleblower Compl. at ¶95.

[18]    *Id.* at ¶91.

| Interferon[19] | 11.5% (2013 Q2) to 7.5% (2015 Q4) |
|---|---|

80.     The Whistleblower Complaint alleges that Biogen documented, in internal documents, that as much as 70% of patients "will change their behavior based on the lack of copay assistance."[20]   The Whistleblower Complaint cites Biogen's previous use of this strategy in early 2014 regarding the hemophilia drug, Alprolix, where the Company provided free drugs to as many as 51% of its patients afflicted with hemophilia to capture as many patients as possible.[21]

81.     Biogen was aware that it could not directly pay patients' co-pays after switching them over to Medicaid, because this would clearly violate the AKS and other federal laws, so it instead schemed to funnel copay money to its patients through targeted charitable donations and through the unlawful use of charitable entities.   The PSD worked with PAPs to ensure that the patients' copays would be covered, providing the PAPs with grant money which was to be used to specifically cover Biogen patient copays.   Biogen then was reimbursed by the various Sponsors for the remaining price of the drugs. Biogen also kept reserve money on hand to ensure that the various PAPs were sufficiently funded, and that all patient co-pays were covered.   For

---

[19]     For economic and certain other purposes, Biogen sometimes classifies Avonex with its other interferon drugs, though Avonex, the last of Biogen's MS drugs,is the principal drug in the group.

[20]     Whistleblower Compl. at ¶94.

[21]     *Id.*

example, in 2015, Biogen budgeted a "coverage gap reserve" for four drugs to be $44.1 million, in addition to $111.9 million in co-pay assistance.[22]

82.     Biogen would often use Advanced Care Scripts Inc. ("ACS"),[23] another specialty pharmacy, as an intermediary to communicate and coordinate copay payments with the PAPs, so that Biogen's copay assistance would be used exclusively for Biogen's MS Drugs.  Most PAPs operate on a first-come, first-served basis, so Biogen's patients needed to be enrolled within days of Biogen's donation in order to be captured by that donation.[24]  Biogen would inform ACS of its intention to donate to a specific PAP.  ACS would send over a "batch file" of Biogen patients' applications to the PAP for copay coverage.  At certain times, ACS shared with Biogen lists of its patients for whom ACS had helped to obtain copay coverage from a PAP.[25]  This use of a middleman between Biogen and the PAPs served to obscure the Company's illegal scheme.

83.     As the Whistleblower complaint alleges,[26] the coordination between the PAPs, Biogen, and US Bioservices was crucial to Biogen's scheme.  The PAPs were fully aware of the scheme.  In an email to a Biogen Vice President, TAF's co-founder referenced the "TYS[abri] project," with the two entities coordinating to cover the co-pays of Tysabri patients.[27]  The PAPs

---

[22]     *See* Whistleblower Compl. at ¶123.

[23]     For a period, Biogen used the McKesson Corporation for this purpose.

[24]     *See* Whistleblower Compl. at ¶¶5; 7; 105; 121.

[25]     *Id.* at ¶¶104-107; *see also* Department of Justice, Settlement Agreement at ¶3, https://www.justice.gov/usao-ma/press-release/file/1346596/download (last visited Jan. 18, 2022).

[26]     *See* Whistleblower Compl. at ¶¶100-107.

[27]     Department of Justice, U.S. Attorney's Office, *Third Foundation Resolves Allegations that it Conspired with Pharmaceutical Companies to Pay Kickbacks to Medicare Patients,* Nov.

continually provided Biogen with data.[28] Biogen tracked each prescription and knew which Medicare and Medicaid Prescriptions were covered by a PAP, and US Bioservices would transfer patients from their free drug program to new specialty pharmacies in the year before the patients' switch to the PAP coverage.[29]

84.     The success of the sweeps directly impacted Biogen's revenue, therefore Biogen carefully analyzed all data to figure out whether the sweeps were still lucrative and worth the risk.[30] For example, one 2012 analysis explained that there was a $4.5 million upside in revenue for Avonex due in part to "[i]mproved execution on Access program," which swept 500 patients more than had been forecast.[31]

85.     As the Whistleblower complaint alleges, in 2015, the Company's CFO and Biogen's legal department were getting concerned for the level of sweeps planned for the first fiscal quarter due to increased OIG scrutiny.  Consequently, the whistleblower was ordered to prepare a return on investment ("ROI") analysis of charity donations for the fourth quarter of

---

20, 2019, https://www.justice.gov/usao-ma/pr/third-foundation-resolves-allegations-it-conspired-pharmaceutical-companies-pay-kickbacks.

[28]     Biogen also utilized its REMS Program to obtain patient-specific data. A REMS program (or Risk Evaluation and Mitigation Strategy) is a series of protocols the FDA may impose on manufacturers of drugs or biologicals that pose enhanced safety risks. Among the protocols is the collection of patient-specific data. *See* Whistleblower Compl. at ¶107.

[29]     The timing was important to ensure that new patients would have their copays immediately covered by Biogen's grants, and to avoid regulations that preclude a patient from being eligible for Medicare Part D within the same year that they received free drugs. *See* Whistleblower Compl. at ¶¶100-107; 121.

[30]     Whistleblower Compl. at ¶122.

[31]     *Id.*

2014 to justify the financial returns on its scheme.[32]   The ROI analysis demonstrated that the Company would be able to match 90% of its contributions to the PAP with Biogen patients on the MS Drugs.  The expected ROI was $18 for every dollar donated to the "charity."[33]

### D.   Biogen Retaliates Against Employees Who Report Improper Conduct

86.    On July 13, 2018, a former Biogen employee filed a lawsuit against the Company, claiming that she had been terminated in retaliation for raising concerns in a formal ethics complaint about improper off-label marketing of a Biogen drug.[34]   The former employee, Danita Erickson   ("Erickson") alleged that she was pressured to ensure a multiple sclerosis drug, Zinbryta, was prescribed by a hematologist to a patient with aplastic anemia, which was not an FDA-approved use.[35]

87.    The complaint alleged that Erickson called the Biogen Corporate Hotline in early December 2017 to make a report about the fraudulent promotion of Zinbryta for a Medicare patient that she believed to be in violation of federal law and Biogen's own ethics policies.[36] According to the Company's website, compliance concerns reported to the hotline are

---

[32]     *Id.* at ¶¶130-131.

[33]     *Id.*

[34]     *See* Maia Anderson, *Former Biogen Sales Rep Wins $6M in Retaliation Lawsuit, Becker's Hospital Review*, Nov. 8, 2109, https://www.beckershospitalreview.com/pharmacy/for mer-biogen-sales-rep-wins-6m-in-retaliation-suit.html.

[35]     *Id.*

[36]     *See Erickson v. Biogen Inc.,* No. 18--01029 (W.D. Wash. July 13, 2018), ECF No. 1 (Complaint), ¶ 3.41.

"forwarded directly to the Chair of the Audit Committee,"[37] *i.e.*, Defendant Dorsa.  Rather than take action to prevent the misconduct flagged by Erickson, Biogen subsequently terminated her employment.

88.    In an order granting partial summary judgment, Judge Coughenour found that because Erickson had repeatedly communicated her concerns to her supervisors, the compliance hotline, human resources, and Biogen's in-house counsel, the Company was fully aware of the illegal conduct reported by Erickson.[38]   A federal jury in Seattle awarded Erickson nearly six million dollars.

**E.    The DOJ Intervenes In The Whistleblower Lawsuit And Fines Biogen And Its Conspirators**

89.    On November 20, 2019, the DOJ announced that TAF, one of Biogen's co-conspirators in its seed and sweep scheme for its MS Drugs, had agreed to pay four million dollars to resolve allegations that it violated the False Claims Act through its role in kickback schemes with Biogen and two other pharmaceutical companies.  TAF also entered into a three-year integrity agreement with HHS-OIG. The integrity agreement requires, among other things, that TAF implement measures designed to ensure that it will operate independently and that its arrangements and interactions with pharmaceutical manufacturer donors comply with the law.  In addition, the integrity agreement requires compliance-related certifications from the Board of

---

[37]    Biogen, Contact Us, https://www.biogen.com/en_us/contact.html (last visited Jan. 18, 2022).

[38]    *Erickson*, ECF No. 93, (Order) p. 18. ("Plaintiff's communication to the ethics hotline, as well as two supervisors, a human resources partner, and in-house counsel, were sufficient to make Defendant aware of Plaintiff's protected activity.")

Directors and detailed reviews by independent review organizations.[39]  TAF also agreed to give

the DOJ unrestricted access to interview its employees and directors and review related

documents.[40]

90.     United States Attorney Andrew E. Lelling admonished TAF and its co-

conspirators for undermining the Medicare program through illegal kickbacks:

> Pharmaceutical companies and foundations cannot undermine the Medicare
> program through the use of kickbacks disguised as routine charitable donations.
> TAF operated as a vehicle for specific pharmaceutical companies to pay
> kickbacks at the ultimate expense of the American taxpayers who support the
> Medicare program. We will continue to pursue this kind of enforcement until the
> practice disappears.

91.     Joseph R. Bonavolonta, Special Agent in Charge of the FBI Boston Division

described the scheme as a "corrupt practice[]":

> TAF cared more about helping its big pharma donors make money than about
> helping individual patients in need of life changing assistance. The FBI is proud
> to be a part of the investigation that brought TAF's corrupt practices to light, and
> we will continue to seek justice against any person or entity involved in such
> schemes.

92.     In its Quarterly Report on Form 10-Q filed with the SEC on July 22, 2020 for the

period ended June 30, 2020, Biogen disclosed:

> We have learned that state and U.S. governmental authorities are investigating our
> sales and promotional practices and have received related subpoenas. . . .
>
> We have received subpoenas and other requests from the U.S. government for
> documents and information relating to our relationship with non-profit
> organizations that assist patients taking drugs sold by Biogen and the government

---

[39]     Department of Justice, U.S. Attorney's Office *supra* note 27.

[40]     *See*  Department of Justice, Settlement Agreement, https://www.justice.gov/usao-ma/press-release/file/1218686/download, at ¶11.

has challenged some of our contributions to these organizations. We have reached an agreement in principle with the government to resolve this matter.

93.     In December 2020, the DOJ intervened in the whistleblower suit against Biogen alleging that the Company violated the AKS and False Claims Act, 31 U.S.C. §§ 3729-3733, by illegally using foundations as a conduit to pay the copays of Medicare patients taking Biogen's MS drugs.

94.     On December 17, 2020, the DOJ announced that Biogen had agreed to pay a $22 million fine to the DOJ to settle the allegations in the Complaint.[41]

95.     In a separate settlement with the DOJ, ACS agreed to pay $1.4 million.[42] In the settlement agreement, ACS agreed to give the DOJ unrestricted access to interview its employees and directors and review related documents.[43]

96.     First Assistant United States Attorney Nathaniel R. Mendell commented[44] that Biogen used the charitable foundations as conduits to pay 's scheme:

> Biogen coordinated with ACS to game the foundation system by timing its payments to two foundations with its transfer of financially needy free drug patients, all so that Biogen could obtain significant financial rewards. By treating the foundations simply as conduits to pay the co-pays of its own patients, Biogen

---

[41]     Department of Justice, Office of Public Affairs, *Biogen Agrees to Pay $22 Million to Resolve Alleged False Claims Act Liability for Paying Kickbacks*, Dec. 17, 2020, https://www.justice.gov/opa/pr/biogen-agrees-pay-22-million-resolve-alleged-false-claims-act-liability-paying-kickbacks.

[42]     Department of Justice, Settlement Agreement, https://www.justice.gov/usao-ma/press-release/file/1346596/download (last visited Jan. 18, 2022).

[43]     Department of Justice, Settlement Agreement, https://www.justice.gov/usao-ma/press-release/file/1346596/download, at ¶13 (last accessed on January 18, 2022).

[44]     *See* Department of Justice, Office of Public Affairs, *supra* note 41.

violated the anti-kickback statute and undermined Medicare's co-pay structure, which Congress intended as a safeguard against inflated drug prices.

97.     Phillip Coyne, a special agent from the OIG's Boston Regional Office, warned that kickbacks schemes such as the one engaged in by Biogen and its co-conspirators "undermine our healthcare system":

> Kickback schemes can undermine our healthcare system and lead to higher costs for the Medicare program. We will continue to hold pharmaceutical companies and specialty pharmacies accountable if they work together to subvert the charitable donation process and violate the prohibition on the payment of kickbacks. [45]

98.     Acting Assistant Attorney Jeffrey Bossert Clark of the Department of Justice's Civil Division expressed the government's commitment to penalizing such misconduct:

> The resolution announced today [with Biogen], like prior settlements concerning similar misconduct, demonstrates the government's commitment to hold accountable companies that pay kickbacks to undermine important constraints on rising drug costs. Drug companies that illegally manipulate charitable patient assistance programs to subsidize copays for their own products will be held accountable.

**F.     Humana Sues Biogen And ACS For Nearly Two Billion Dollars**

99.     On September 24, 2021, Humana, one of the Medicare Part D Sponsors, filed a lawsuit against Biogen and its intermediary, ACS, in the United States District Court for the District of Massachusetts, *Humana Inc v. Biogen Inc. et al.*, No. 1:21-cv-11578 (D. Mass), alleging that Biogen and ACS had violated the RICO Act, 18 U.S.C. §1962 (c) and (d), the AKS, 42 U.S.C. §1320a-7b(b), and various state laws through its illegal sales and marketing practices for the MS Drugs.  Humana, seeks $1.9 billion in damages for prescription costs, costs for provider visits, and various related administrative, investigative, and legal costs.

---

[45]     *Id.*

100.    On October 20, 2021, Biogen filed with the SEC its Quarterly Report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 10-Q"), which discloses the filing of the Humana Lawsuit:

*Humana Patient Assistance Litigation*

In September 2021 Humana Inc. (Humana) filed suit against us in the U.S. District Court for the District of Massachusetts alleging damages related to our providing MS patients with free medications and making charitable contributions to non-profit organizations that assist MS patients. Humana alleges violation of the federal RICO Act and state laws and seeks statutory treble damages, attorneys' fees and costs. No trial date has been set. An estimate of the possible loss or range of loss cannot be made at this time.

**G.    Biogen's Misconduct Relating To FDA Approval Of Aducanumab**

**1.    Background**

101.    Alzheimer's disease causes brain cells which process, store, and retrieve information to degrade and die.  The root causes of Alzheimer's disease are not entirely understood by scientists.  Numerous pharmaceutical products have attempted to prevent the build-up of amyloid beta,[46] a protein that some believe is a root cause of the disease, but most have failed to prevent the onset of Alzheimer's disease.[47]

102.    Aducanumab is a monoclonal antibody, which is a laboratory-made clone of naturally occurring antibodies.  Antibodies are proteins that circulate through the body until they find, and attach to, other proteins known as antigens.  The antibody thereby draws the immune

---

[46]    Biogen, A Letter from Biogen's CEO on Aduhelm, https://www.biogen.com/en_us/ceo-letter-alzheimers-therapy.html (last visited Jan. 18, 2022).

[47]    Dev Mehta et al., *Why Do Trials for Alzheimer's Disease Drugs Keep Failing? A Discontinued Drug Perspective for 2010-2015*, NCBI, May 19, 2017 https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5576861/.

system cells' attention to the protein, which these cells then destroy.  Biogen originally claimed that aducanumab could selectively target large concentrations of amyloid beta, known as oligomers, which allowed the drug to be administered in high doses without compromising patient safety.

103.    At the time of aducanumab's development, Biogen's business was declining, having lost repeatedly to its competitors in the generic drug space and "beyond its marketed drugs, Biogen ha[d] a very thin pipeline."[48]  As Defendant Vounatsos stressed at the J.P. Morgan Healthcare Conference in 2019, shortly before the failure of the clinical trials, *"[s]o is there any product in any pipeline from any company that can be at par with aducanumab and can compensate for potential failure of such a major product?  So I don't think so."*

104.    Mohit Bansal, a Citigroup analyst, described the importance of aducanumab to Biogen's core business, stating that "[Biogen] is basically a declining business.  In the case of an aducanumab non-approval, it just becomes a very difficult investment story."[49]

### 2.    Aducanumab Trials Are Halted And Then Revived

105.    Aducanumab's Phase III clinical trials consisted of two identically designed international studies, Study 301 (also known as "ENGAGE") and Study 302 (also known as "EMERGE"), each with about 1,600 patients.  Each study was divided into three groups of equal size: placebo, low dose and high dose.  The studies' primary endpoint was the change in CDR-

---

[48]    Joanne Fag, *Biogen's Reliance on Aducanumab Deepens*, *Evaluate Vantage*, June 19, 2020, https://www.evaluate.com/vantage/articles/news/snippets/biogens-reliance-aducanumab-deepens.

[49]    Josh Nathan-Kazis, *Biogen's Alzheimer's Drug Faces A Big Test. What to Know*, *Barrons*, Feb. 7, 2021, https://www.barrons.com/articles/biogens-big-bet-on-its-alzheimers-drug-what-happens-to-the-biotechs-stock-51612526499.

SB[50] scores, a measure of cognitive and functional decline, after 18 months.  Aducanumab was not expected to improve (lower) CDR-SB scores, or even maintain any present cognitive abilities, but only to slow cognitive and functional decline.  While Studies 301 and 302 were identical in design, they started one month apart, with Study 301 beginning first and remaining ahead in enrollment.

106.    In March 2019, Biogen halted aducanumab's clinical trials because, based on a pre-specified intermediate "futility" analysis, aducanumab had failed to show efficacy and it was improbable that the clinical trials would reach their endpoints if continued to conclusion.

107.    On March 21, 2019, Biogen disclosed that aducanumab clinical trials were being shelved.  In reaction to the news, Biogen's stock price fell 30 percent, losing $16 billion in market value.

108.    RBC Capital Markets Analyst Brian Abrahams wrote that "[w]e view this as a transformative failure for Biogen's pipeline,"[51] and predicted that further declines were in the cards given that "[i]nvestors owned Biogen to not miss out on what could have been one of the biggest blockbuster products in the pipeline of large biopharma."[52]

---

[50]    Cogstate, Clinical Dementia Rating-Sum of Boxes, Mar. 16, 2021, https://www.cogstate.com/blog/cdr-sb-in-future-ad-clinical-trials/ quoting Dr. Chris Edgar ("The CDR Sum of Boxes has emerged as an important clinical trial outcome for early Alzheimer's disease clinical trials along with a number of other commonly used assessments.")

[51]    Julie Steenhuysen et al, *Biogen Scraps Two Alzeheimer Drug Trials, Wipes $18 Billion from Market Value*, *Reuters*, Mar. 21, 2019, https://www.reuters.com/article/us-biogen-alzheimers/biogen-scraps-two-alzheimer-drug-trials-wipes-18-billion-from-market-value-idUSKCN1R213G.

[52]    *Id.*

109.    J.P. Morgan viewed the halt of aducanumab trials as a "disaster scenario playing out for Biogen":

> [W]e see today's discontinuation of the Phase 3 trials for aducanumab in Alzheimer's disease as the disaster scenario playing out for Biogen. . . . Without the Alzheimer's lottery ticket in hand, we believe the company faces an uncertain and difficult path forward given a mature – albeit resilient – MS business, significant competition looming for Spinraza, and no clear-cut pipeline asset to cling to as a future value driver. Accordingly, we are not surprised to see BIIB shares trade off and at a massive discount to peers.
>
> ***
>
> On the heels of this news, we have removed all Alzheimer's (adu, 8AN2401, etc.) value from our model and are downgrading shares to Neutral.

110.    Thereafter, Biogen formed a plan to revive the aducanumab clinical trials.

111.    First, the Company tweaked Study 302.  Utilizing a set of data collected between a pre-determined futility cutoff date and when futility was declared, Biogen was able to find Study 302 just barely statistically significant on its primary endpoint.  However, Study 301 was more problematic, as the original data had shown that the Alzheimer drug made things worse.  In Study 301, patients on high dose aducanumab did worse than on a placebo. When the FDA receives an application with one positive and one negative clinical study, it will, at best, ask the sponsor to run another trial.  With the study only looking at results after eighteen months plus the added time it would take to gather new subjects, Biogen was looking at years before it could conduct another study.  So, the Company attempted to spin the old data in a new way.

112.    Biogen assigned 49 of its statisticians to go over the Study 301 data to find any pretext to claim that the study might support aducanumab's approval.  Eventually, Biogen claimed that Study 301 had done worse than Study 302 because the subjects in Study 301 had

generally received lower doses of the drug, resulting in less plaque being removed.[53]   Biogen insisted that the studies proved that there was direct correlation between removal of plaque and an improvement in patient condition, but concealed data that pointed to the opposite conclusion.

113.    For example, Biogen claimed that a high dose of 10mg/kg of aducanumab was enough to achieve positive results.   However, Biogen concealed data that demonstrated this explanation was false:[54]

- In Study 302, Carriers (those who carried the APOE4 gene) who received 6mg/kg achieved better outcomes than those who received 10mg/kg;

- The number of 10mg/kg doses had no impact in Study 302;

- APOE4 non-carriers (Non-Carriers or APOE4 Non-Carriers), who should have received the greatest benefit of all because they always received the 10mg/kg dose and their treatment was never interrupted by side effects[55], saw no benefit in either Study 301 or 302.

114.    Biogen also hid any variation in the data due to regional or cultural differences between patients.   Neglecting to account for these variations is fatal to any clinical study involving Alzheimer's disease, because symptoms of the disease vary widely from patient to

---

[53]     Defendants had amended the trials' protocol in March 2017.  The amendment altered the maximum possible dose for patients who carried a gene that predisposed them to Alzheimer's Disease (ApoE ε4, or APOE4 herein), who made up two thirds of the study population.  Since Study 301 started before Study 302 (prior to the amendment), more subjects in Study 302 received the maximum 10 mg/kg dose of aducanumab for a longer portion of their treatment.

[54]     *See Shash et al. v. Biogen Inc. et al.*, No. 21-10479 (D. Mass. Mar. 19, 2021), ECF No. 58 (Complaint) ¶11.

[55]     Carriers initially received a lower dose of the drug because APOE4 also predisposes them to a serious side effect of aducanumab.

patient based on their birthplace and culture.[56]  Culture and region also affect trial subjects'
responses to interviewer questions while determining cognitive abilities.

115.    Biogen also provided much less information to the public about the Phase III
aducanumab clinical trials than it had in the past in relation to other clinical trials.[57]  In a
December 2019 conference call to discuss Phase III aducanumab clinical trials, Biogen's Chief
Medical Officer, Alfred Sandrock ("Sandrock") admitted as much in response to analyst
questioning:[58]

> I mean, look, as we said at the very beginning of this call, we're not presenting
> any data that we didn't already present this morning. ***And you're right, I mean,
> typically, we do present a lot of things, subgroups included, in the past. You're
> right, we did do that. There's a time and a place for everything.*** And look, this
> will soon be under review at regulatory authorities. And so for that reason, we're
> very sensitive about what we want to present now. ***We have nothing to hide.*** But
> there's a time and a place for everything. And in due time, I look forward to
> presenting all the data that make it important for – so that physicians can make the
> very best benefit/risk decisions if the drug becomes approved.

### 3.    Biogen Pressures The FDA To Approve Aducanumab Through a Collaboration With FDA Officials

116.    According to a June 23, 2021 STAT News article and confirmed by a July *New
York Times* article,[59] in or around May 2019, Sandrock secretly approached Dr. Billy Dunn

---

[56]    *See Shash,* ECF No. 58 (Complaint) ¶¶233-246.

[57]    *Id.* at ¶¶345-348.

[58]    *Id*. at ¶346.

[59]    Pam Belluck et al, *How An Unproven Alzeheimer's Drug Got Approved*, N.Y. Times,
https://www.nytimes.com/2021/07/19/health/alzheimers-drug-aduhelm-fda.html (last visited Jan.
18, 2022).

("Dunn"), the head of the FDA's Neuroscience Office, with whom Sandrock had a longstanding professional relationship, about aducanumab and enlisted him to push for FDA approval.

117.    Shortly after the meeting, Biogen created Project Onyx, an effort to get aducanumab approved by the FDA despite data pointing to its lack of efficacy.[60]

118.    On October 22, 2019, in an earnings call to discuss Biogen's third quarter earnings, Defendant Vounatsos disclosed that, "based on discussion with the FDA," the Company was pursuing FDA approval for aducanumab and reiterated Biogen's claims regarding the clinical trials:

> This is an important day as we are announcing that based on discussion with the FDA, we plan to submit a regulatory filing in the U.S. for aducanumab. If approved, aducanumab will become the first therapy to reduce clinical decline in Alzheimer's disease and the first therapy to show that removing amyloid beta can lead to better clinical outcomes.
>
> ***
>
> It is also important to highlight that the path taken in the pursuit of discovering and developing breakthrough treatments is not always direct and straightforward.
>
> As you know in March, we announced our decision to discontinue the Phase 3 EMERGE and ENGAGE studies for aducanumab in Alzheimer's disease based on a pre-specified futility analysis. ***In retrospect the result of our futility analysis was incorrect. Based on what we know now it is clear that the pre-specified futility criteria did not adequately anticipate the effect of all the variables in these trials.***
>
> So, what happened?  First, the decision to stop these trials relied on an earlier and smaller data set comprised only of patients who had the opportunity to complete 18 months of treatment as of December 26, 2018. At that time, the futility analysis predicted that the trials were unlikely to meet the primary endpoint upon

---

[60]    Adam Fuerstein et al, *Inside Project Onyx: How Biogen Used an FDA Back Channel to Win Approval of its Polarizing Alzheimer's Drug, msn,* June 19, 2021, https://www.msn.com/en-us/news/us/inside-e2-80-98project-onyx-e2-80-99-how-biogen-used-an-fda-back-channel-to-win-approval-of-its-polarizing-alzheimer-e2-80-99s-drug/ar-AALzzpL.

completion. Futility analyses are common in large studies and they use statistical modeling to attempt to predict the outcome of the studies based on a number of pre-specified assumptions and criteria. There are multiple methodologies that can be used for futility analysis and the methodology we use was a well-accepted approach.

*However, based on what we have learned, we know now that the futility analysis did not adequately account for the effect that the earlier enrollment in ENGAGE had on patients' overall exposure to high dose aducanumab.*

\*\*\*

*We will work towards this goal with the regulatory authorities, principal investigators and the institutional review boards with a sense of urgency.* I know this development is unexpected for all our stakeholders, including the many patients involved in our clinical studies and their families, our investigators, our investors and our employees. And I am sure you have a lot of questions. We were also surprised when we initially learned about the potential implication of these additional data, but our surprise quickly turned to the hope that we may be in the position to offer Alzheimer's patients the first step to reduce clinical decline in this devastating disease.

119.    Biogen officials and Dunn and his team had a formal meeting on June 17, 2020 to discuss a path forward for the approval of aducanumab.   According to the minutes of the meeting,[61] the group discussed various options about how to get aducanumab approved and decided upon a *collaborative* effort between the agency and Biogen, citing "the wholly unique situation that is the current state of the aducanumab development program**."**[62]

---

[61]    FDA, Center for Drug Evaluation and Research, Administrative and Correspondence Documents, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/761178Orig1s000Admin Corres.pdf (last visited Jan. 18, 2022).

[62]    Pam Belluck et al, *How An Unproven Alzheimer's Drug Got Approved. See also* FDA, Center for Drug Evaluation and Research, Administrative and Correspondence Documents, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2021/761178Orig1s000AdminCorres.pdf (last visited Jan. 18, 2022).

120.    According to the *New York Times* article, following the June 17 meeting, Biogen officials presented the plan to collaborate with the FDA to the Board, which included all of the Individual Defendants.[63]  When the plan of collaboration was presented, "people were just blown away that this would be the situation and that aducanumab actually might have a forward path."[64]

121.    This collaboration flew in the face of the independent and impartial stance required of the FDA.[65]  For example, Dunn worked closely with Dr. Samantha Budd Haeberlein, who led Biogen's clinical development of the Alzheimer drug, making joint presentations or appearing together on conference panels, during the aducanumab trials.[66]  Dr. Michael Carome, a prominent physician who later testified before the Advisory Committee stated:[67]

> [The] FDA became a partner with Biogen, and they made the decision about whether to approve the drug.  They were not objective, unbiased regulators.  It seems as if the decision was preordained.

122.    William B. Schultz, who served as a deputy F.D.A. commissioner and general counsel at HHS, commented on the impropriety of such relationships:

> It is not appropriate for F.D.A. officials to collaborate on publications and presentations with employees of companies with applications pending before those very officials. It undermines the essential arm's-length relationship between the regulator and the regulated industry and destroys the F.D.A.'s credibility as the government agency entrusted with the critical responsibility of deciding the safety and efficacy of drugs.[68]

---

[63]    Pam Belluck et al, *How An Unproven Alzeheimer's Drug Got Approved*.

[64]    *Id.*

[65]    Jeffrey Toobin, *The Road to Aduhelm*.

[66]    Pam Belluck et al, *How An Unproven Alzeheimer's Drug Got Approved*.

[67]     Jeffrey Toobin, *The Road to Aduhelm*.

[68]    Pam Belluck et al, *How An Unproven Alzeheimer's Drug Got Approved*.

123. On July 22, 2020, Biogen held a conference call with financial analysts regarding its second quarter 2020 results, on which Defendant Vounatsos stated:

> *This submission followed ongoing collaboration with the FDA and include data from a comprehensive clinical development program, including EMERGE, the first positive Phase III study ever in this space together with supporting data from the Phase III ENGAGE study* and positive results from the Phase Ib PRIME study. Our data show that aducanumab may help to both reduce the decline of cognitive function and help patients' ability to perform certain activities of daily living, which for some patients may result in independence for a longer period of time.

124. Dunn and Biogen made a joint presentation to the Advisory Committee in November 2020 to push for the approval of aducanumab, despite the impropriety of an FDA reviewer presenting together with a drug company before an FDA committee.[69] The briefing materials presented to the Advisory Committee were effusive about the positive effects of the drug and buried a negative report by Dr. Tristen Massie ('Massie"), the FDA's statistical reviewer, by designating it as merely a draft.[70] The data presented by Dr. Massie demonstrated that removing amyloid plaque does not improve clinical outcomes and did not stop the progression of Alzheimer's disease.

125. In November 2020, the Advisory Committee voted to reject aducanumab with ten committee members voted against approval, and only one member weighing in as "uncertain."[71]

---

[69]    Jeffrey Toobin, *The Road to Aduhelm*.

[70]    A UBS analyst remarked in a November 5, 2020 report that the Massie report was "buried at the end of the documents and seemed superseded by FDA's prior commentary." No statistical review presented to an FDA advisory committee has ever been identified as a draft. *Shash*, No. 21-10479, ECF No. 58. (Complaint), ¶273.

[71]    Ned Pagliarulo, '*A Hugely Consequential Decision:' How Biogen's Alzheimer's Drug Came to Face the FDA*, *Biopharmadive*, May 27, 2021,

The votes against approval were predicated on the negative data in the briefing materials[72] and on a biostatistical assessment from the FDA.

126.    As a result, when trading resumed on November 9, 2020, Biogen's stock price plummeted 28.2% to $236.26 per share from its previous close of $328.90 per share.

127.    In meetings in March and April 2020, a majority of the agency's Medical Policy and Program Review Council declared that the Alzheimer drug did not meet the threshold for "instilling public confidence in the usefulness of the drug."[73]  However, at the end of the April meeting, Dr. Rick Pazdur, head of FDA's oncology center, proposed accelerated approval of aducanumab, based on its ability to remove the plaque caused by amyloid beta, a surrogate endpoint.[74]

128.    In a February 2021 earnings call, Vounatsos announced a timeline for FDA approval and discussed the hypothesis that aducanumab could remove plaque and arrest the spread of Alzheimer's disease:

> *We are committed to working with the FDA as it completes its review of the aducanumab application and we continue to stand behind our clinical data. We believe our results support approval.*

\*\*\*

---

https://www.biopharmadive.com/news/biogen-aducanumab-alzheimers-fda-drug-review/600897/.

[72]    FDA, PCNS Drugs Advisory Committee Meeting, Briefing Document, Nov. 6, 2020, https://www.fda.gov/media/143502/download.

[73]    Pam Belluck et al, *How An Unproven Alzheimer's Drug Got Approved.*

[74]    Surrogate endpoints are commonly used in oncology, and also in vaccines.  While not the traditional approval route, at this point this was Biogen's only chance to get its Alzheimer drug on the market.

We are waiting an important decision on aducanumab in the U.S now expected by early June.
***[O]ur belief in the therapeutic approach of targeting amyloid plaques has never been stronger. We believe that our data supports the approval of aducanumab.***

129.   In a hastily arranged April 2021 meeting, Dunn's boss, Dr. Patrizia Cavazzoni led a small meeting to vote on accelerated approval of aducanumab.  The vote was facilitated by including officials whose specialties had nothing to do with neurological drugs.   Not surprisingly, the only clear vote against the approval of aducanumab was the director of the office of biostatistics, which had already weighed in that there was "insufficient evidence to support accelerated approval or any other type of approval."[75]

130.   On June 7, 2021, the FDA approved aducanumab using the accelerated approval process.[76]

131.   On June 7, 2021, Biogen's stock price skyrocketed by over $100 per share, to close at $395.85 per share, up from its closing price of $286.14 per share on June 6, 2021.

### 4.   The Backlash Following FDA Approval

132.   The reaction from the medical world, federal government, and even Biogen researchers to the unusual approval of Aducanumab was swift and harsh.[77]  How do you get from

---

[75]   Pam Belluck et al, *How An Unproven Alzeheimer's Drug Got Approved.*

[76]    FDA, *FDA Grants Accelerated Approval for Alzheimer's Drug*, Jun 7, 2021, https://www.fda.gov/news-events/press-announcements/fda-grants-accelerated-approval-alzheimers-drug . Accelerated approval allows the authorization of drugs without persuasive proof of benefit if they are for serious diseases with few treatment options and if the drug affects part of the disease's biology (known as a biomarker) in a way that is "reasonably likely to predict clinical benefit."

[77]   Alice Park et al., *Clinics Won't Provide It. Insurers Won't Cover It. So Will the First Alzheimer's Drug Make a Difference?*, *Time*, Aug. 5, 2021, https://time.com/6081333/biogen-alzheimers-drug-aduhelm-fda-controversy/.

a drug that's about to not be developed any further because of futility to all of a sudden being a drug that could be approved?" asked Constantine Lyketsos, a professor of psychiatry and Alzheimer's specialist at Johns Hopkins University.[78]

133.    The American Neurological Association published a statement that aducanumab should not have been approved.[79]

134.    Dr. Vissia Viglietta, a former Biogen senior medical director, who helped plan late-stage clinical trials of the drug stated that "[t]his approval should not have happened.   It defeats everything I believe in scientifically and it lowers the rigor of regulatory bodies."[80]

135.    On June 15, 2021, Congressmen Peter Welch from Vermont sent a letter to Defendant Vounatsos demanding answers for the $56,000 price tag for aducanumab.[81]

136.    Senator Joe Manchin of West Virginia called for the FDA's acting commissioner's replacement over the aducanumab approval decision.[82]

---

[78]    Ned Pagliarulo, '*A Hugely Consequential Decision.'*

[79]     Am. Neurological Ass'n, ANA Executive Committee Commentary on the FDA Aproval of Aduhelm, https://myana.org/publications/news/ana-executive-committee-commentary-fda-approval-aduhelm (last visited Jan. 18, 2022).

[80]    Pam Belluck et al, *How An Unproven Alzheimer's Drug Got Approved.*

[81]    Press Release, June 15, 2021, https://welch.house.gov/media-center/press-releases/welch-biogen-ceo-how-did-biogen-justify-56000-list-price.

[82]     Noah Higgins-Dunn, *Key Senator Calls for Woodcock's Removal as FDA Fallout from Biogen Alzheimer's Approval Heat Up*, *Fierce Pharma*, June 18, 2021, https://www.fiercepharma.com/pharma/sen-manchin-calls-for-woodcock-s-removal-as-fda-fallout-from-biogen-alzheimer-s-approval.

137.     On June 23, 2021, Massachusetts' second largest[83] health insurer, Point32Health, said that Biogen should cut aducanumab's price by a factor of roughly ten based on the drug's questionable benefits and potential risks.[84]

138.     On June 29, 2021, StatNews released an exclusive investigative report detailing Biogen's misconduct related to aducanumab and its efforts to pressure the FDA for approval of the drug which the Company dubbed "Project Onyx."[85]

139.     In July 2021, Mt. Sinai Health System, the Cleveland Clinic, and a network that operates 52 hospitals and more than 1,000 outpatient clinics announced they would not administer aducanumab.[86]

140.     On July 23, 2021, Point32Health issued statements concluding that aducanumab was "experimental and investigational."[87]

141.     Two House Committees launched investigations into Biogen's relations with the FDA.[88]  The Committee on Oversight and Reform and the Committee on Energy and Commerce

---

[83]     Tufts Health Plan and Harvard Pilgrim Health Care merged to create Point32Health.

[84]     Jonathan Saltzman, *State's Second Largest Health Insurance Slams Biogen for Costly Alzheimer's Drug*, *Boston Globe,* June 23, 2021, https://www.bostonglobe.com/2021/06/23-business-states-second-largest-health-insurer-slams-biogen-costly-alzheimers-drug/.

[85]     Adam Fuerstein et al, *Inside Project Onyx: How Biogen Used an FDA Back Channel.*

[86]     Joseph Walker, *Cleveland Clinic, Mount Sinai and Providence Won't Give Biogen's New Alzheimer's Drug*, *The Wall Street Journal*, Jul 15, 2021, https://www.wsj.com/articles-cleveland-clinic-mount-sinai-wont-give-biogens-new-alzheimers-drug-11626366968.

[87]     Provider News, https://tuftshealthplan.com/provider/provider-news/2021/aduhelm.

[88]     Zachary Brennan, *House Committees Kick Off Investigation into how Biogen's Aduhelm Won Approval*, *Endpoints News*, July 13, 2021, https://endpts.com/house-committees-kick-off-investigation-into-how-biogens-aduhelm-won-approval/.

sent a letter to Defendant Vounatsos detailing their concerns and asking for specific documents.[89] The letter contained numerous allegations of improper communications with regulators, pricing, and questions about Biogen's data used to justify the clinical benefits of aducanumab. The letter also cited to the June 29 *Stat* investigative report.

142.   The longest-serving Secretary of the HHS called for the OIG to investigate contacts between high-level FDA staff and Biogen.  Days later, the FDA's acting commissioner, Janet Woodcock, joined the request.[90]

143.   On August 8, 2021, the OIG announced a broad investigation into the FDA's accelerated approval of aducanumab.[91]

144.   On October 20, 2021, in a conference call to discuss financial results for the third quarter of 2021, Vounatsos backtracked on his former confidence in the efficacy of aducanumab calling the drug "the first treatment to address an underlying pathology of Alzheimer's disease which is ***reasonably likely*** to predict clinical benefit."

145.   On November 8, 2021, RBC analyst Brian Abrahams reported that a patient died shortly after taking aducanumab. The FDA is actively investigating the death.[92]

---

[89]    *See* Letter from Carolyn B. Mahoney, Chairwoman, Committee on Oversight and Reform, to Michael Vountasos (July 12, 2021), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-07-12.CBM%20Pallone%20to%20Vounatsos-Biogen%20re%20Aduhelm.pdf.

[90]    *See* Thomas M. Burton, *FDA Seeks to Probe Talks Between Staff and Biogen on Alzheimer's Drug*, *The Wall Street Journal,* July 9, 2021, https://www.wsj.com/articles/fda-to-probe-communications-between-staff-and-biogen-on-alzheimers-drug-11625849975.

[91]    OIG Website, https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000608.asp.

[92]    John Carroll et al., *Exclusive: FDA Probing Death of Aduhelm Patient as Biogen's Alzheimer's Drug Continues to Stir Controversy*, *Endpoints News*, Nov. 18, 2021,

146.    On November 15, 2021, Sandrock, the chief proponent of aducanumab at Biogen, resigned. Company insiders reported that Vounatsos forced Sandrock out, blaming him for the backlash following the aducanumab approval.[93]

147.    On November 23, 2021, a new study emerged that 35% of patients taking aducanumab had brain swelling.[94]

148.    In early December 2021, The European Union and Japan's drug regulator denied approval of aducanumab, and the Company was forced to cut the price of aducanumab in half.

149.    On December 20, 2021, Alzheimer's disease researchers along with medical professors from Harvard University and Johns Hopkins issued a formal statement  asking the FDA to swiftly pull aducanumab from the market.[95]   The group includes two of the Advisory Committee members who resigned from the body following the FDA's approval of aducanumab. The statement used strongly condemned the  FDA's actions:[96]

> [Aducanumab] did not meet the FDA's own criteria for accelerated approval based on surrogate markers because amyloid plaque does not correlate well with symptoms, severity of disease or progression. In two prematurely terminated

---

https://endpts.com/rbc-analyst-reports-aducanumab-case-file-points-to-the-controversial-alzheimers-drug-as-a-likely-cause-of-patient-death/;
https://www.foxbusiness.com/healthcare/biogen-investigates-death-patient-alzheimers-drug.

[93]    Damian Garde et al, *Biogen CEO: Company Was 'Wrong' about Initial Aduhelm Price, 'Courageous' to Lower it, Stat*, Jan. 10, 2022, https://www.statnews.com/2022/01/10/biogen-ceo-company-was-wrong-about-initial-aduhelm-price-courageous-to-lower-it .

[94]    Rachel Cohrs, *Pharmalittle: Aduhelm Study Shows Brain Swelling in One-Third of Patients, Stat,* Nov. 23, 2021, *https://www.statnews.com/pharmalot/2021/11/23/biogen-aduhelm-alzheimers-covid19-antivirals/.*
[95]    Zachary Brennan, *Alzeheimer's Experts Call on FDA to Pull Biogen's Aduhelm, Endpoints News*, Dec. 21, 2021, https://endpts.com/alzheimers-experts-call-on-fda-to-pull-biogens-aduhelm/.

[96]    *Id.*

trials, one showed no effect, while the other showed an effect that was not clinically meaningful. The FDA's decision to approve Aduhelm is indefensible in both scientific and clinical terms. This drug should be withdrawn from the market immediately. . . .The risks of [aducanumab] are unacceptable. This drug causes high rates of potentially dangerous side effects (disorientation, falling, brain swelling and bleeding) and a risk of death that is yet to be defined.

150.    Speaking at a recent J.P. Morgan Healthcare Conference, Defendant Vounatsos acknowledged that Biogen was "wrong" to price aducanumab at $56,000 per year, based on the widespread negative reaction among physicians, patients, and policymakers.[97]

151.    On January 11, 2022, the Center for Medicare and Medicaid Services released its draft opinion, stating it would only pay for Aduhelm for those patients in a hospital sponsored clinical trial.

152.    Following the release of the CMS' draft opinion, Biogen's stock plummeted to $225 per share, down over $170 from its peak following the FDA's approval of aducanumab.

153.    On February 3, 2022, the Company filed its Annual Report on Form 10-K with the SEC for the period ended December 31, 2021 (the "2021 10-K"). In the 2021 10-K, Biogen disclosed the ongoing investigations by the House of Representatives and the OIG. The Company also disclosed that the SEC and the FTC were investigating Biogen's misconduct relating to aducanumab:

The U.S. House of Representatives Committees on Oversight and Reform and Energy and Commerce and the Office of Inspector General of the U.S. Department of Health and Human Services have announced investigations relating to ADUHELM. In addition, the Company has received a civil investigative demand from the Federal Trade Commission and an inquiry from the Securities and Exchange Commission seeking information relating to ADUHELM, including healthcare sites, ADUHELM's approval and ADUHELM's marketing.

---

[97]    Damian Garde et al, *Biogen CEO: Company Was 'Wrong.'*

154.     The 2021 10-K also revealed dismal sales of aducanumab. The Company only sold one million dollars of the drug in the fourth quarter of 2021 and three million dollars for all of 2021.[98]

**H.     Biogen Is Sued In Two Securities Class Action Lawsuits**

155.     On November 13, 2020, a securities class action complaint was filed in the United States District Court for the Central District of California captioned, *Menashe et al. v. Biogen et al.* No. 1:21-cv-10479-IT (C.D. Cal.), against the Company, Vounatsos, Sandrock and Haeberlein alleging violations of Section 10(b) and Section 20(a) of the Exchange Act of 1934 (the "Exchange Act").   The complaint seeks damages on behalf of a class of persons who purchased or otherwise acquired Biogen shares between October 22, 2019 and November 6, 2020, inclusive.   The plaintiff asserts that the defendants made false and misleading statements regarding the efficacy of aducanumab and the results of  its late stage clinical trials.   The case was subsequently removed to the District of Massachusetts where it remains pending.   On August 4, 2021, an amended securities class action complaint captioned *Shash et al. v. Biogen Inc. et al.*, No. 1:21-cv-10479-IT (D. Mass), was filed against the Company, Vounatsos, Sandrock and Haeberlein alleging violations of Section 10(b) and Section 20(a) of the Exchange Act on behalf of investors who purchased Biogen shares between October 22, 2019 and November 6, 2020, inclusive.

156.     On February 7, 2022, a second securities class action complaint was filed in the United States District Court of Massachusetts captioned, O*kla. Firefighters Pension and*

---

[98]     *See also* Fraiser Kansteiner, *The Hits Keep Coming: Biogen Aduhelm Marketing, Approval Under Fire in New FTC and SEC Probes, Fierce Pharma*, Feb. 4, 2022, https://www.fiercepharma.com/pharma/biogen-s-aduhelm-marketing-approval-under-fire-new-ftc-and-sec-probes.

*Retirement Sys. v. Biogen Inc. et al.* No. 1:22-cv-10200-GAO (D. Mass.). against the Company, Vounatsos, Sandrock, former Biogen CFO Jeffrey Capello, and current CFO Michael McDonnell alleging violations of Section 10(b) and Section 20(a) of the Exchange Act. The complaint seeks damages on behalf of a class of persons who purchased or otherwise acquired Biogen shares between June 7, 2021 and January 11, 2022, inclusive. The plaintiff asserts that the defendants made false and misleading statements regarding the efficacy of aducanumab, the results of  its late stage clinical trials, and the justification for its exorbitant price.

## I.    Biogen's False And Misleading Proxy Statement

157.    On April 23, 2021, Biogen filed its latest Proxy Statement with the SEC (the "Proxy Statement").  Biogen's Proxy Statement solicited stockholders to, among other things, elect thirteen directors to terms on the Board, including Defendants Dorsa, Denner, Hawkins, Leaming, Mantas, Mulligan, Papadopoulos, Posner, Rowinsky, Sherwin, and Vounatsos.  The Proxy Statement was issued by order of the Board and was signed by Defendant Papadopoulos.

158.    The Proxy Statement contained the following statements regarding the Board's commitment to strong corporate governance guidelines:

> Our Board takes its role in protecting the interest of our fellow stockholders and overseeing our long-term business strategy very seriously. We believe that good corporate governance and high ethical standards are key to our success. We are accountable to you, our stockholders, and remain committed to investing time with you to increase transparency and better understand your perspectives.
>
> \*\*\*
>
> We are committed to the highest standards of ethics, business integrity and corporate governance, which we believe will ensure that our company is managed for the long-term benefit of our stockholders. Our governance practices are designed to establish and preserve accountability of our Board of Directors and management, provide a structure that allows our Board to set objectives and

monitor performance, ensure the efficient use and accountability of resources and enhance stockholder value.

159.    The Proxy Statement contained the following statements regarding risk oversight

by the Board:

> We believe that our Board of Directors' primary functions are to appoint, evaluate and hold accountable management, oversee key strategic, operational and compliance risks and ensure optimal capital allocation such that long-term stockholder value is maximized.

***

> **Board Risk Oversight**
>
> Our Board of Directors believes that a fundamental part of risk management is understanding the risks that we face, monitoring these risks and adopting appropriate control and mitigation of these risks. As stated in our Corporate Governance Principles, our Board of Directors and its committees are responsible for "reviewing the Company's risk framework and governance and management's exercise of its responsibility to assess, monitor and manage the Company's significant risk exposures."
>
> Our Board of Directors oversees the management of material risks facing the Company.

***

> Our Board of Directors regularly receives information about our material strategic, operational, financial and compliance risks and management's response to, and mitigation of, such risks. In addition, our risk management systems, including our risk assessment processes. . . compliance programs. . . are designed to inform management and our Board of Directors about our material risks. As part of its risk oversight function, our Board of Directors and its committees review this framework, its operation and our strategies for generating long-term value for our stockholders to ensure that such strategies will not motivate management to take excessive risks.
>
> Our Board of Directors also reviews enterprise risks and discusses them with our management, including issues relevant to our business, reputation and strategy, including. . . pipeline and business development, pricing and patient access, legal and regulatory matters. . . .

160.    The Proxy Statement also stated:

We may recover compensation from our employees, including our executive officers, who engage in detrimental or competitive activity. Detrimental activity includes any action or failure to act that constitutes financial malfeasance that is materially injurious to the Company, violates our Code of Business Conduct (Values in Action), results in a restatement of our earnings or financial results or results in a violation or breach of law or contract.

161.    The foregoing statements in the Proxy Statement were false and misleading and omitted material information. Contrary to the representations made in the Proxy, the Individual Defendants failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

162.    The wrongful conduct alleged herein has damaged Biogen, causing the Company to be the subject of civil lawsuits, a DOJ investigation which culminated in a substantial fine, and irreparably harming its reputation.

## VI.    DERIVATIVE ALLEGATIONS

163.    Plaintiff brings this action derivatively for the benefit of Biogen to redress injuries suffered, and to be suffered, because of the Individual Defendants' breaches of their fiduciary

duties, waste of corporate assets, and the violation of Sections 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

164.    Biogen is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

165.    Plaintiff is, and has been at all relevant times, a Biogen shareholder. Plaintiff adequately and fairly represents the interests of Biogen in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to prosecute this action.

166.    Under the circumstances presented herein, demand is futile and, thus, excused.

### A.    Demand Upon Defendant Vounatsos Is Excused

167.    As admitted by Biogen in its public filings, Vounatsos is the Company's CEO, and therefore is not independent under Nasdaq listing rules. Indeed, Biogen's Proxy Statement does not list Vounatsos as an independent director.  Vounatsos receives substantial compensation from Biogen, including $18,659,829 during fiscal year 2020 alone.  As an employee, Vounatsos derives substantially all of his income from his employment with Biogen, thus he could not consider a demand for action that might require him to sue the directors who control his continued employment.

168.    Vounatsos will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Vounatsos holds 53,072 Biogen shares. If Vounatsos acknowledged that he, Biogen or others engaged in misconduct, his investment in Biogen would be substantially devalued.  Further, if Vounatsos acknowledged that executives at

Biogen had engaged in the wrongdoing alleged, he would be acknowledging that he, as the CEO of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

169.    Vounatsos signed the Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

170.    Vounatsos benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Biogen Board through the false and misleading statements and material omissions in the Proxy Statement.

171.    Defendant Vounatsos is named as a defendant in the pending securities class actions.   As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

172.    Vounatsos, as a director of Biogen, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

173.    Vounatsos knew or should have known that the Company was engaging in an illegal "seed and sweep" scheme, altering the aducanumab clinical studies, and placing undue

pressure on the FDA to approve its Alzheimer drug, thereby subjecting the Company to financial and reputational harm.  Vounatsos was required to investigate and take action to prevent damage to Biogen, its shareholders, and customers, but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to its sales and marketing practices and clinical trials.  Had Vounatsos taken timely action, the damage caused to Biogen could have been prevented or minimized.

174.    Vounatsos is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Vounatsos is futile and, thus, excused.

**B.    Demand Upon Defendant Papadopoulos Is Excused**

175.    Papadopoulos will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Papadopoulos holds 34,771 Biogen shares.  Defendant Papadopoulos has served as a Biogen director for thirteen years and receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $669,822 during fiscal year 2020 alone.  If Papadopoulos acknowledged that he, Biogen, or others engaged in misconduct, his investment in Biogen would be substantially devalued and his lucrative position jeopardized.

176.    Papadopoulos signed the Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

177.    Papadopoulos benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Biogen Board through the false and misleading statements and material omissions in the Proxy Statement.

178.    Papadopoulos has long-standing business relationships with several of the other directors which precludes them from acting in an independent and disinterested manner.  For example, Papadopoulos is an Adjunct Associate Professor of cell biology at NYU and Defendant Rowinsky also works at NYU as an Adjunct Professor of Medicine.  Papadopoulos co-founded Anadys in 1992 and served on its board as a director for eleven years.  Papadopoulos and Posner served together on the board of Anadys with Papadopoulos serving as Chair.

179.    Moreover, Papadopoulos, as a director of Biogen, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

180.    Papadopoulos knew or should have known that the Company was engaging in an illegal "seed and sweep" scheme, altering the aducanumab clinical studies, and placing undue pressure on the FDA to approve its Alzheimer drug, thereby subjecting the Company to financial and reputational harm.  Papadopoulos was required to investigate and take action to prevent damage to Biogen, its shareholders, and customers, but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance

procedures relating to its sales and marketing practices and clinical trials.  Had Papadopoulos taken timely action the damage caused to Biogen could have been prevented or minimized.

181.    Papadopoulos failed to uphold his additional obligations as a member of the Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of Biogen's Corporate Governance Guidelines.

182.    Papadopoulos is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Papadopoulos is futile and, thus, excused.

### C.    Demand Upon Defendant Denner Is Excused

183.    Defendant Denner will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Denner holds 655,954 Biogen shares. Defendant Denner has served as a Biogen director for twelve years and receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $439,314 during fiscal year 2020 alone.  If Denner acknowledged that he, Biogen, or others engaged in misconduct, his investment in Biogen would be substantially devalued and his lucrative position jeopardized.

184.    Denner authorized the Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

185.    Denner benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Biogen Board through the false and misleading statements and material omissions in the Proxy Statement.

186.    Moreover, Denner is the founding partner and Chief Investment Officer at Sarissa. Sarissa's largest investment to date is in Alkermes PLC ("Alkermes"), with beneficial ownership of shares representing over eight percent of the company.[99]   Alkermes has a license and collaboration agreement with Biogen which gives Biogen an exclusive, worldwide license to develop and commercialize Vumerity, another MS drug.[100]   If Denner acknowledged that he, Biogen, or others engaged in misconduct, Alkermes' investment in Biogen would be substantially devalued and his lucrative position jeopardized.

187.    Denner has long-standing business relationships with several of the other directors which precludes them from acting in an independent and disinterested manner.  Denner founded Sarissa with Defendant Mulligan and currently works as its Chief Investment Officer.  Denner and Mulligan both have a close business relationship with billionaire Carl Icahn ("Icahn"), and worked with each other on several projects when Denner was Icahn's deputy at Icahn Capital.[101] Denner worked with Icahn and Mulligan on "multiple biotech targets," including ImClone and Biogen.[102] Denner and Mulligan both joined the Board of Biogen in 2009 in order to promote

---

[99]    Whale Wisdom, https://whalewisdom.com/filer/sarissa-capital-management-lp#tabholdings_tab_link (last visited Jan. 18, 2022).

[100]    Alkermes' Annual Report on Form 10-K, filed with the SEC on February 11, 2021 for the period ended December 31, 2020 (Alkermes' 2020 10-K), p. 10.

[101]    Meg Tirrel, *Icahn, After Break from Biopharma Activism, Hires Harvard Geneticist Richard Mulligan*, *CNBC,* https://www.cnbc.com/2017/03/01/icahn-after-break-from-biopharma-activism-hires-richard-mulligan.html.

[102]    *Id.*

Icahn's interests at Biogen.[103]   Denner, Mulligan, and Rowinsky all served on the board of ImClone[104] before it was acquired by Eli Lilly, in 2008, through Icahn and Denner's efforts.[105] Icahn formally brought Mulligan onboard at Icahn Capital in 2017.[106]   Denner and Mulligan served together on the Board of Enzon Pharmaceuticals Inc. ("Enzon") for four years.  Denner was appointed the Chair of the Enzon Board in 2010 and appointed Mulligan to serve as the Vice-Chair in 2011.  Denner joined the board of Bioverativ, a spinoff from Biogen, at the same time as Posner, with Posner serving as the Chair of the Board.[107]  Denner later negotiated the sale of Bioverativ to Sanofi, making approximately $122 million in the deal.[108]

188.   Moreover, Denner, as a director of Biogen, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's

---

[103]    Tracy Staton, *It's Official: Two Icahn Allies Join Biogen Board*, *Fierce Pharma*, June 10, 2009, https://www.fiercepharma.com/pharma/it-s-official-two-icahn-allies-join-biogen-board.

[104]    Mulligan also served as Chief Medical Officer at ImClone Systems.

[105]    Icahn nominated Denner and Mulligan to the board of ImClone when he gained control of the company in 2006. Bloomberg News, *Icahn Takes Control of ImClone, Ousts Its Chief Executive, L.A. Times*, https://www.latimes.com/archives/la-xpm-2006-oct-26-fi-imclone26-story.html; Dow Jones, *Icahn Reaches an Agreement with ImClone, N.Y. Times*, https://www.nytimes.com/2006/08/24/business/icahn-reaches-an-agreement-with-imclone.html.

[106]    *Id.*

[107]
          *See* https://www.sec.gov/Archives/edgar/data/1681689/000104746917000137/a2230658z 8-k.htm (last visited Jan. 18, 2022).

[108]    Tracy Staton, *How Did Sanofi Win Over Bioverativ? It Upped its Bid and Called on Activist Alex Denner*, *Fierce Pharma*, Feb. 9, 2018, https://www.fiercepharma.com/m-a/sanofi-played-it-by-books-for-bioverativ-deal-proxy.

officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

189.     Denner knew or should have known that the Company was engaging in an illegal "seed and sweep" scheme, altering the aducanumab clinical studies, and placing undue pressure on the FDA to approve its Alzheimer drug, thereby subjecting the Company to financial and reputational harm. Denner was required to investigate and take action to prevent damage to Biogen, its shareholders, and customers, but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to its sales and marketing practices and clinical trials.  Had Denner taken timely action, the damage caused to Biogen could have been prevented or minimized.

190.     Denner failed to uphold his additional obligations as Chair of the Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of Biogen's Corporate Governance Guidelines.

191.     Denner is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.   Any demand upon Defendant Denner is futile and, thus, excused.

**D.**     **Demand Upon Defendant Dorsa Is Excused**

192.    Defendant Dorsa will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments. Dorsa holds 21,097 Biogen shares. Defendant Dorsa has served as a Biogen director for more than eleven years and receives substantial compensation in the form of fees, stock awards, and other compensation based on her service as a director, including $424,314 during fiscal year 2020 alone.  If Dorsa acknowledged that she, Biogen, or others engaged in misconduct, her investment in Biogen would be substantially devalued and her lucrative position jeopardized.

193.    Dorsa authorized the Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

194.    Dorsa benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Biogen Board through the false and misleading statements and material omissions in the Proxy Statement.

195.    Moreover, Dorsa, as a director of Biogen, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

196.    Dorsa knew or should have known that the Company was engaging in an illegal "seed and sweep" scheme, altering the aducanumab clinical studies, and placing undue pressure on the FDA to approve its Alzheimer drug, thereby subjecting the Company to financial and reputational harm.  Dorsa was required to investigate and take action to prevent damage to Biogen, its shareholders, and customers, but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to its sales and marketing practices and clinical trials.  Had Dorsa taken timely action, the damage caused to Biogen could have been prevented or minimized.

197.    Moreover, as Chair of the Audit Committee, Dorsa had duties regarding oversight of the risks facing the Company and Biogen's compliance with relevant laws, rules, and regulations.  Dorsa utterly failed to perform these essential duties.

198.    Dorsa is not independent and faces a substantial likelihood of liability for her breaches of fiduciary duty and violations of federal securities laws.   Any demand upon Defendant Dorsa is futile and, thus, excused.

**E.    Demand Upon Defendant Leaming Is Excused**

199.    Defendant Leaming will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  Leaming holds 12,988 Biogen shares. Defendant Leaming has served as a Biogen director for thirteen years and receives substantial compensation in the form of fees, stock awards, and other compensation based on her service as a director, including $437,814 during fiscal year 2020 alone.  If Leaming acknowledged that she, Biogen, or others engaged in misconduct, her investment in Biogen would be substantially devalued and her lucrative position jeopardized.

200.    Leaming authorized the Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

201.    Leaming benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing her re-election to the Biogen Board through the false and misleading statements and material omissions in the Proxy Statement.

202.    Leaming currently sits on the board of directors of Rosie's Place, a large not for profit organization, and serves as Chair of its Audit Committee.  Each year, Biogen donates generously to Rosie's Place.  Therefore, if Leaming acknowledged that she, Biogen, or others engaged in misconduct, she would jeopardize Biogen's continuing contributions to the charity, which she would not do.[109]

203.    Moreover, Leaming, as a director of Biogen, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

---

[109]    *See e.g.,* https://issuu.com/rosiesplace/docs/rp_annual_report_2019  pp. 20-21 (last visited Jan. 18, 2022).

204.    Leaming knew or should have known that the Company was engaging in an illegal "seed and sweep" scheme, altering the aducanumab clinical studies, and placing undue pressure on the FDA to approve its Alzheimer drug, thereby subjecting the Company to financial and reputational harm.  Leaming was required to investigate and take action to prevent damage to Biogen, its shareholders, and customers, but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to its sales and marketing practices and clinical trials.  Had Leaming taken timely action, the damage caused to Biogen could have been prevented or minimized.

205.    Moreover, as a member of the Audit Committee, Leaming had duties regarding oversight of the risks facing the Company and Biogen's compliance with relevant laws, rules, and regulations.  Leaming utterly failed to perform these essential duties.

206.    Leaming is not independent and faces a substantial likelihood of liability for her breaches of fiduciary duty and violations of federal securities laws.   Any demand upon Defendant Leaming is futile and, thus, excused.

**F.      Demand Upon Defendant Mantas Is Excused**

207.    Defendant Mantas will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.   Mantas holds 2,943 Biogen shares. Defendant Mantas receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $409,314 during fiscal year 2020 alone. If Mantas acknowledged that he, Biogen, or others engaged in misconduct, his investment in Biogen would be substantially devalued and his lucrative position jeopardized.

208.    Mantas authorized the Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

209.    Mantas benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Biogen Board through the false and misleading statements and material omissions in the Proxy Statement.

210.    Moreover, Mantas, as a director of Biogen, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters;  (3) implement and maintain  an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

211.    Mantas knew or should have known that the Company was engaging in an illegal "seed and sweep" scheme, altering the aducanumab clinical studies, and placing undue pressure on the FDA to approve its Alzheimer drug, thereby subjecting the Company to financial and reputational harm.  Mantas was required to investigate and take action to prevent damage to Biogen, its shareholders, and customers, but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures

relating to its sales and marketing practices and clinical trials.  Had Mantas taken timely action, the damage caused to Biogen could have been prevented or minimized.

212.    Mantas failed to uphold his additional obligations as a member of Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of Biogen's Corporate Governance Guidelines.

213.    Mantas is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Mantas is futile and, thus, excused.

### G.    Demand Upon Defendant Hawkins Is Excused

214.    Defendant Hawkins will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Hawkins holds 2,045 Biogen shares. Defendant Hawkins receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $409,314 during fiscal year 2020 alone. If Hawkins acknowledged that he, Biogen, or others engaged in misconduct, his investment in Biogen would be substantially devalued and his lucrative position jeopardized.

215.    Hawkins authorized the Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

216.    Hawkins benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Biogen Board through the false and misleading statements and material omissions in the Proxy Statement.

217.    Moreover, Hawkins, as a director of Biogen, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was

complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters;  (3) implement and maintain  an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

218.    Hawkins knew or should have known that the Company was engaging in an illegal "seed and sweep" scheme, altering the aducanumab clinical studies, and placing undue pressure on the FDA to approve its Alzheimer drug, thereby subjecting the Company to financial and reputational harm.  Hawkins was required to investigate and take action to prevent damage to Biogen, its shareholders, and customers, but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to its sales and marketing practices and clinical trials.  Had Hawkins taken timely action, the damage caused to Biogen could have been prevented or minimized.

219.    Moreover, as a member of the Audit Committee, Hawkins had duties regarding oversight of the risks facing the Company and Biogen's compliance with relevant laws, rules, and regulations.   Hawkins utterly failed to perform these essential duties.

220.    Hawkins is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.   Any demand upon Defendant Hawkins is futile and, thus, excused.

### H.   Demand Upon Defendant Mulligan Is Excused

221.   Defendant Mulligan will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Mulligan holds 12,954 Biogen shares. Defendant Mulligan has served as a Biogen director for over twelve years and receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $409,314 during fiscal year 2020 alone.   If Mulligan acknowledged that he, Biogen, or others engaged in misconduct, his investment in Biogen would be substantially devalued and his lucrative position jeopardized.

222.   Mulligan authorized the Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

223.   Mulligan benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Biogen Board through the false and misleading statements and material omissions in the Proxy Statement.

224.   Moreover, Mulligan is a founding partner of Sarissa. Sarissa's largest investment to date is in Alkermes, with beneficial ownership of shares representing over eight percent of the company.[110]   Alkermes has a license and collaboration agreement with Biogen which gives Biogen an exclusive, worldwide license to develop and commercialize Vumerity, another MS drug.[111]  If Mulligan acknowledged that he, Biogen, or others engaged in misconduct, Alkermes' investment in Biogen would be substantially devalued and his lucrative position jeopardized.

---

[110]    Whale Wisdom, https://whalewisdom.com/filer/sarissa-capital-management-lp#tabholdings_tab_link (last visited Jan. 18, 2022).

[111]    Alkermes' latest Annual Report on Form 10-K, filed with the SEC on February 11, 2021 for the period ended December 31, 2020 (Alkermes' 2020 10-K), p. 10.

225.    Mulligan has long-standing business relationships with several of the other directors which precludes them from acting in an independent and disinterested manner. Mulligan founded Sarissa with Denner.  Mulligan and Denner both have a close business relationship with billionaire Icahn, and worked with each other on several projects when Denner was Icahn's deputy at Icahn Capital.[112]  Mulligan worked with Denner and Icahn on "multiple biotech targets," including ImClone and Biogen.[113]  Mulligan and Denner both joined the Board of Biogen in 2009 in order to promote Icahn's interests at Biogen.[114]  Mulligan, Denner and Rowinsky all served on the board of ImClone[115] before it was acquired by Eli Lilly, in 2008, through Icahn and Denner's efforts.[116]  Icahn formally brought Mulligan onboard at Icahn Capital in 2017.[117]  Denner and Mulligan served together on the Board of Enzon for four years.  Denner was appointed the Chair of the Enzon Board in 2010 and appointed Mulligan to serve as the Vice-Chair in 2011.

226.    Moreover, Mulligan, as a director of Biogen, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2)

---

[112]    Meg Tirrel, *Icahn Hires Harvard Geneticist Richard Mulligan*.

[113]    *Id.*

[114]    Tracy Staton, *It's Official: Two Icahn Allies Join Biogen Board*.

[115]    Mulligan also served as Chief Medical Officer at ImClone Systems.

[116]    Icahn nominated Denner and Mulligan to the board of ImClone when he gained control of the company in 2006. Bloomberg News, *Icahn Takes Control*; Dow Jones, *Icahn Reaches an Agreement with ImClone*.

[117]    *Id.*

implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

227.    Mulligan knew or should have known that the Company was engaging in an illegal "seed and sweep" scheme, altering the aducanumab clinical studies, and placing undue pressure on the FDA to approve its Alzheimer drug, thereby subjecting the Company to financial and reputational harm.  Mulligan was required to investigate and take action to prevent damage to Biogen, its shareholders, and customers, but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to its sales and marketing practices and clinical trials.  Had Mulligan taken timely action the damage caused to Biogen could have been prevented or minimized.

228.    Moreover, as a member of the Compensation Committee, Mulligan had a duty to recoup any compensation illegally or improperly obtained by any of the other directors or officers of Biogen.  Mulligan utterly failed to perform this essential duty.

229.    Mulligan is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.   Any demand upon Defendant Mulligan is futile and, thus, excused.

## I.      Demand Upon Director Posner Is Excused

230.    Defendant Posner will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Mulligan holds 7,760 Biogen shares. Defendant Posner has served as a Biogen director for thirteen years and receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $434,314 during fiscal year 2020 alone.  If Posner acknowledged that he, Biogen, or others engaged in misconduct, his investment in Biogen would be substantially devalued and his lucrative position jeopardized.

231.    Posner authorized the Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

232.    Posner benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Biogen Board through the false and misleading statements and material omissions in the Proxy Statement.

233.    Posner has long-standing business relationships with several of the other directors which precludes them from acting in an independent and disinterested manner.  Papadopoulos and Posner served together on the board of Anadys, a company which Papadopoulos co-founded, with Papadopoulos serving as Chair of the Board.  Posner joined the board of Bioverativ, a spinoff from Biogen, at the same time as Denner, with Posner serving as the Chairman of the Board.[118]  Denner later negotiated the sale of Bioverativ to Sanofi, making approximately $122 million in the deal.[119]

---

[118]    *See* https://www.sec.gov/Archives/edgar/data/1681689/000104746917000137/a2230658 z8-k.htm (last accessed January 18, 2022).

[119]    Tracy Staton, *How Did Sanofi Win Over Bioverativ?*.

234.    Moreover, Posner, as a director of Biogen, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

235.    Posner knew or should have known that the Company was engaging in an illegal "seed and sweep" scheme, altering the aducanumab clinical studies, and placing undue pressure on the FDA to approve its Alzheimer drug, thereby subjecting the Company to financial and reputational harm.  Posner was required to investigate and take action to prevent damage to Biogen, its shareholders, and customers, but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to its sales and marketing practices and clinical trials.  Had Posner taken timely action the damage caused to Biogen could have been prevented or minimized.

236.    Moreover, as Chair of the Compensation Committee, Posner had a duty to recoup any compensation illegally or improperly obtained by any of the other directors or officers of Biogen. Posner utterly failed to perform this essential duty.

237.    Posner is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Posner is futile and, thus, excused.

**J.    Demand Upon Defendant Rowinsky Is Excused**

238.    Defendant Rowinsky will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Rowinsky holds 17,069 Biogen shares.  Defendant Rowinsky has served as a Biogen director for over eleven years and receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $409,314 during fiscal year 2020 alone.   If Rowinsky acknowledged that he, Biogen, or others engaged in misconduct, his investment in Biogen would be substantially devalued and his lucrative position jeopardized.

239.    Rowinsky authorized the Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

240.    Rowinsky benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Biogen Board through the false and misleading statements and material omissions in the Proxy Statement.

241.    Rowinsky has long-standing business relationships with several of the other directors which precludes them from acting in an independent and disinterested manner.  For example, Rowinsky works at NYU as an Adjunct Professor of Medicine and Papadopoulos is an Adjunct Associate Professor of cell biology at NYU. Rowinsky, Mulligan and Denner all served on the board of ImClone[120] before it was acquired by Eli Lilly, in 2008, through Icahn and

---

[120]    Mulligan also served as Chief Medical Officer at ImClone Systems.

Denner's efforts.[121]   Rowinsky was appointed to Biogen in 2010 through a nomination from Icahn Capital which was attempting to increase its influence on the Biogen Board.[122]   On April 28, 2010, Biogen filed a Proxy Statement with the SEC that describes the arrangement between Icahn Capital and Biogen:

> In March 2010, we entered into an agreement with Mr. Icahn and entities affiliated with Mr. Icahn pursuant to which, among other things, (1) they agreed to withdraw their notice of nomination of directors and business for the Annual Meeting and vote their shares of our common stock at the Annual Meeting in favor of our director nominees and (2) we agreed to appoint Dr. Rowinsky and Dr. Sherwin to our Board of Directors and include them in our slate of director nominees at the Annual Meeting.

242.   Moreover, Rowinsky, as a director of Biogen, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

---

[121]   Icahn nominated Denner and Mulligan to the board of ImClone when he gained control of the company in 2006. Bloomberg News, *Icahn Takes Control*; Dow Jones, *Icahn Reaches an Agreement with ImClone*.

[122]   *See Boston Business Journal*, https://www.bizjournals.com/boston/blog/mass-high-tech/2010/03/biogen-elects-two--including-icahn-nominee.html (last visited January 18, 2022).

243.    Rowinsky knew or should have known that the Company was engaging in an illegal "seed and sweep" scheme, altering the aducanumab clinical studies, and placing undue pressure on the FDA to approve its Alzheimer drug, thereby subjecting the Company to financial and reputational harm.  Rowinsky was required to investigate and take action to prevent damage to Biogen, its shareholders, and customers, but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to its sales and marketing practices and clinical trials.  Had Rowinsky taken timely action, the damage caused to Biogen could have been prevented or minimized.

244.    Rowinsky failed to uphold his additional obligations as a member of the Corporate Governance Committee, which include, *inter alia*, ensuring the implementation and effectiveness of Biogen's Corporate Governance Guidelines.

245.    Rowinsky is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Rowinsky is futile and, thus, excused.

**K.    Demand Upon Defendant Sherwin Is Excused**

246.    Defendant Sherwin will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Sherwin holds 16,328 Biogen shares. Defendant Sherwin has served as a Biogen director for over eleven years and receives substantial compensation in the form of fees, stock awards, and other compensation based on his service as a director, including $409,314 during fiscal year 2020 alone. If Sherwin acknowledged that he, Biogen, or others engaged in misconduct, his investment in Biogen would be substantially devalued and his lucrative position jeopardized.

247.   Sherwin authorized the Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

248.   Sherwin benefitted from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Biogen Board through the false and misleading statements and material omissions in the Proxy Statement.

249.   Sherwin has long-standing business relationships with several of the other directors which precludes them from acting in an independent and disinterested manner. Sherwin was appointed to the Biogen Board at the same time as Rowinsky, in an agreement with Icahn Capital.[123]   As part of the agreement, Icahn Capital agreed to vote its shares for Biogen's nominees, including Sherwin and abandon a threatened proxy fight.

250.   Moreover, Sherwin, as a director of Biogen, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

---

[123]   Biogen, Investor Relations, *Biogen Idec Appoints Eric Rowinsky and Stephen Sherwin to Board of Directors Pursuant to Agreement with Icahn Partners*, Mar. 22, 2010, https://investors.biogen.com/news-releases/news-release-details/biogen-idec-appoints-eric-rowinsky-and-stephen-sherwin-board.

251.    Sherwin knew or should have known that the Company was engaging in an illegal "seed and sweep" scheme, altering the aducanumab clinical studies, and placing undue pressure on the FDA to approve its Alzheimer drug, thereby subjecting the Company to financial and reputational harm.  Sherwin was required to investigate and take action to prevent damage to Biogen, its shareholders, and customers, but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls and corporate governance procedures relating to its sales and marketing practices and clinical trials.  Had Sherwin taken timely action, the damage caused to Biogen could have been prevented or minimized.

252.    Moreover, as a member of the Audit Committee, Sherwin had duties regarding oversight of the risks facing the Company and Biogen's compliance with relevant laws, rules, and regulations.   Sherwin utterly failed to perform these essential duties.

253.    Sherwin is not independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Sherwin is futile and, thus, excused.

**L.    Other Factors Demonstrating That Demand Upon
The Individual Defendants Is Excused**

254.    Biogen has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the members of the Board have not filed any lawsuits or taken any action against those responsible for the wrongful conduct.

255.    Additionally, suit by the current directors of Biogen to remedy the wrongs complained of herein would expose Defendant Vounatsos to liability for violations of the federal securities laws in the pending securities class action.  If the Board elects for the Company to press forward with its right of action against Defendant Vounatsos in this action, then Biogen's

efforts would compromise its defense of the securities class action.  Accordingly, demand on the Board is excused.

256.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

257.    Upon information and belief, Biogen has Directors & Officers Liability Insurance ("D&O Insurance") policies that contain provisions that would eliminate coverage for any action brought by the Individual Defendants against each other, known as the "insured versus insured exclusion."

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM
**Against the Individual Defendants for Violations of
Section 14(a) of the Exchange Act**

258.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

259.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the Section 14(a) nonfraud claims.

260.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

261.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

262.    The Proxy Statement contained the false and misleading statements related to risk oversight by the Board, the Company's commitment to strong corporate governance principles, and the recoupment of compensation.  Contrary to these statements, the Individual Defendants were required to, but failed to:  (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers;

and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

263.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statement were materially false and misleading.    These misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statement, including, but not limited to the election of directors, ratification of an independent auditor, an advisory vote on executive compensation, the addition of a federal forum selection clause, and other stockholder proposals.

264.    The false and misleading statements and material omissions in the Proxy Statement led to the re-election of the Individual Defendants, which allowed them to continue breaching their fiduciary duties to Biogen.

265.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statement.

266.    Plaintiff on behalf of Biogen has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duty**

267.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

268.    Each Individual Defendant owed to the Company the duty to exercise good faith, loyalty, candor and due care in the management and administration of Biogen's business and affairs.    The Board also had specific duties pursuant to the Company's corporate governance

practices and procedures that, had they been discharged in accordance with the Board's obligations, would have prevented, or at least minimized, the misconduct and consequential harm to Biogen alleged herein.

269.    The Individual Defendants each violated their fiduciary duties to Biogen and its stockholders by, among other things, failing to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Biogen's core operations; (2) implement and maintain an effective system of internal controls to ensure that the Company's officers, directors, and employees were complying with its Code of Conduct, its Corporate Governance Guidelines, and its corporate charters; (3) implement and maintain an effective system of internal controls and corporate governance practices and procedures to monitor the material risks posed to the Company, its stockholders, and customers; and (4) take action when presented with red flags regarding misconduct in connection with the Company's sales and marketing practices, clinical trials, and applications for FDA approval.

270.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Biogen has sustained and continues to sustain significant damages and its business and reputation have been irreparably damaged.

271.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.  Plaintiff on behalf of Biogen has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Waste of Corporate Assets**

272.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

273.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have subjected Biogen to substantial liability, irreparably damaged the Company's business and reputation, and wasted corporate assets.

274.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

275.    Plaintiff on behalf of Biogen has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Aiding and Abetting**

276.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

277.    The Individual Defendants are each in breach of their fiduciary duties to the Company and have participated in such breaches of fiduciary duties.

278.    In committing the wrongful acts pled herein, each of the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

279.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

280.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Biogen, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Biogen;

(c)    Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

(d)    Determining and awarding to Biogen the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(e)    Directing Biogen to take all necessary action to reform and improve its compliance, internal control systems and corporate governance practices and procedures to comply with applicable laws and protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, reforming the Company's compliance, internal controls and corporate governance practices and

procedures as necessary to prevent violations of federal and state healthcare laws, rules and regulations, and taking such other action as may be necessary;

(f)      Awarding Biogen restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by them;

(g)      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

(h)      Granting such other and further relief as the Court deems just and proper.

## IX.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 9, 2022          By:  */s/Theodore M. Hess-Mahan*
                                      Theodore M. Hess-Mahan, BBO #557109
                                      Hutchings Barsamian Mandelcorn, LLP
                                      110 Cedar Street, Suite 250
                                      Wellesley Hills, MA 02481
                                      Telephone: (781) 431-2231 Ext. 234
                                      Facsimile: (781) 431-8726
                                      thess-mahan@hutchingsbarsamian.com

                                      David C. Katz
                                      Mark D. Smilow
                                      Joshua M. Rubin
                                      **WEISSLAW LLP**
                                      305 Broadway, 7th Floor
                                      New York, New York 10007
                                      Telephone: (212) 682-3025
                                      Facsimile: (212) 682-3010
                                      Email: dkatz@weisslawllp.com
                                             msmilow@weisslawllp.com
                                             jrubin@weisslawllp.com

                                      *Counsel for Plaintiff*